593 So.2d 759 (1992)
STATE of Louisiana
v.
Troy WRIGHT.
No. 90-KA-537.
Court of Appeal of Louisiana, Fifth Circuit.
January 15, 1992.
*760 John M. Crum, Jr., Rodney A. Brignac, Office of Dist. Atty., Edgard, for plaintiff-appellee.
Richard S. Thomas, Baton Rouge, for defendant-appellant.
Before GAUDIN, GRISBAUM and WICKER, JJ.
GAUDIN, Judge.
Troy Wright was convicted of aggravated rape (LSA-R.S. 14:42) and first degree robbery (LSA-R.S. 14:64.1) by a jury in the 40th Judicial District Court. He was sentenced to a total of 90 years and six months at hard labor.
For the following reasons, we affirm Wright's convictions. We vacate and set aside Wright's sentence, which included 40 years for forcible rape, 24 years for first degree robbery and 26 years, six months for being a multiple offender. We remand for resentencing.

THE CRIMES
On November 26, 1988, a man subsequently identified as Wright robbed and raped a female cashier at a store in LaPlace, Louisiana, which is in St. John the Baptist Parish.
Wright entered the store at approximately 4 a.m. and walked behind the counter to the register. When the cashier told Wright that he could not come behind the counter, he pulled out a gun, saying that he was going to blow the cashier's head off if she did not give him money. Wright then took cash from the register and from a safe.
The cashier was then taken by Wright into an office where he ordered her to undress. Being in fear for her life, she *761 complied. Wright forced the cashier down and vaginally raped her.
Wright made the cashier leave the store with him; however, when he tried to force her into his vehicle, she broke free and ran. As she was running, she turned around and saw Wright driving down the highway toward New Orleans. While outside, the cashier saw that Wright was driving a silverish gray Chevrolet Corsica which had a rainbow air freshener in the window.
The cashier ran back into the store, locked the door and called the police. When officers arrived, she told them what had occurred and gave them a description of Wright and his vehicle. She described Wright as black, about 5'8" or 5'9" and weighing 175-200 pounds. She also informed the police that Wright had a mustache and was wearing a blue jeans jacket.
Meanwhile, Wright was speeding toward New Orleans on Airline Highway. As he sped through St. Charles Parish, which is between St. John and Orleans parishes, he was clocked by St. Charles Deputy Michael Constantino at 113 miles per hour. This was at approximately 4:20 a.m. Constantino gave chase in his police unit and finally caused Wright to stop. After a backup police unit arrived on the scene, Constantino left Wright with another deputy and returned to his auto to "write up" traffic tickets to give Wright for speeding and for running through a red light while he (Constantino) was in pursuit.
While Constantino was in his car, a message came over the radio advising that an armed robbery and rape had just taken place in St. John the Baptist Parish. Seeing that the automobile he had stopped fit the description of the wanted vehicle, Constantino asked Wright if he was coming from St. John. Wright said that he had never been in St. John before; however, the fact that Wright was observed coming over the Spillway Bridge means that he was coming out of St. John.
Wright was wearing a blue jeans jacket, Constantino said, and inside the car was a rainbow air freshener.
Wright was advised of his rights and brought to the store, where the cashier positively identified Wright as the individual who had robbed and raped her. She also identified Wright's car.
After this positive identification, Wright was arrested. Later that day, the cashier was shown a photographic lineup. She again identified Wright. She also made an in-court identification.

ASSIGNMENTS OF ERROR
Wright was tried in November, 1989, but a mistrial was declared. Wright's second trial was on February 20, 21 and 22, 1990. Guilty verdicts were returned.
On appeal, Wright assigns these district court errors:
(1) the trial judge erred in denying his request for a change of venue,
(2) the state was allowed to twice place him on trial in violation of double jeopardy clauses of the United States and Louisiana constitutions,
(3) the trial judge erroneously allowed a prosecution witness, Dr. Robert C. Giles, to testify,
(4) he (Wright) was not properly identified,
(5) the trial judge erred in denying a motion to quash the indictment because of the misconduct of public (police) officials, particularly Chief of Detectives Joseph Oubre and Detective Lieutenant Robert Hay,
(6) one of Wright's requested jury charges was not given, and
(7) the sentences imposed were excessive and illegal.

ASSIGNMENT NO. 1
Wright filed a motion for change of venue which was heard on January 24, 1990. Wright contends that he was prejudiced by articles in The Times-Picayune and L'Observateur (LaPlace) newspapers and that it was impossible for him to receive a fair and impartial trial.
There were numerous articles, according to Wright, but one in particular was especially inflammatory. That article was printed in the L'Observateur on December *762 24, 1989 and contained information given to the reporter by several police officers.[1]
LSA-C.Cr.P. art. 622 lists the grounds for a change of venue. The article says:
"A change of venue shall be granted when the applicant proves that by reason of prejudice existing in the public mind, or because of undue influence, or that for any other reason, a fair and impartial trial can not be obtained in the parish where the prosecution is pending.
"In deciding whether to grant a change of venue the court shall consider whether the prejudice, the influence, or the other reasons are such that they will affect the answers of jurors on the voir dire examination or the testimony of witnesses at the trial."
Wright's motion for change of venue was heard a month before the trial started and two months after the December 24, 1989 issue of the L'Observateur was published. Both the pretrial motions and Wright's trial were held in Edgard. At the motion to change venue, a jury venire of 50 persons was summoned, of whom 17 were examined by attorneys and the district judge. None of those questioned said he or she had read the December 24th L'Observateur article. The trial judge denied the motion for a venue change and noted this in written reasons assigned on February 9, 1990:
"In his closing statement ... counsel for the defendant (Wright) conceded that there were no grounds for a change of venue."
On February 15, 1990, in additional assigned reasons, the trial judge wrote:
"... this court has no tangible evidence that this defendant's rights have been so violated that he cannot obtain a fair trial in this, the most remote courthouse in the state. Edgard has neither radio, TV or a daily newspaper ..."
The trial began in Edgard on February 20, 1990, with selection of the jury. The record shows that a panel of seven men and five women was chosen, with two alternates, a man and a woman. They were not identified by race although we note that neither the racial makeup of the venire nor that of the trial jury is at issue.
Our very close examination of the voir dire transcript indicates that while several potential jurors had some knowledge of the case, none of the jurors chosen demonstrated any prejudice or gave any indication that he or she could not render a fair, impartial individual verdict. In fact, Wright's counsel used up only ten of 12 peremptory challenges allowed by LSA-C.Cr.P. art. 799. He (Wright's counsel, in his brief) did not point precisely to any one person who, for any reason, could not have given Wright fair and impartial consideration. Wright's brief did refer specifically to the questioning of one person who advised the court that he had heard talk of the impending trial and that the defendant was guilty. This person, however, was asked numerous questions thereafter and was then accepted as a juror by both the state and the defense.
All prospective jurors were questioned at length. The 12 picked to hear the case included a welder, a housewife, an electrician, two school teachers, two insurance sales persons, two Shell employees, two industrial mechanics employed by Dupont and a retired Greyhound bus driver. All answered questions straightforwardly and were approved by both the prosecution and Wright's attorney. None had any real knowledge of the robbery and rape Wright was charged with.
Nonetheless, appellant cites the December 24, 1989 L'Observateur article and argues in relatively general terms that residents of the Edgard-LaPlace area were well informed of the court proceedings and the criminal charges against Wright. The record offers only slight and inconsequential proof of this. The voir dire did not suggest that there had been widespread publicity concerning the crimes and it (the voir dire) certainly did not reveal any prejudicial individual or community attitude toward Wright. Equally important, Wright's lawyer accepted the 12 jurors selected to hear the case and was left with two unused *763 peremptory challenges when the jury was seated.
In State v. Bell, 315 So.2d 307 (La.1975), the Supreme Court of Louisiana itemized at page 311 factors for the trial judge to consider in determining whether to change venue. These considerations are:
(1) the nature of pretrial publicity and the particular degree to which it has been circulated in the community,
(2) the connection of government officials with the release of the publicity,
(3) the length of time between the dissemination of the publicity and the trial,
(4) the severity and notoriety of the offense,
(5) the area from which the jury is to be drawn,
(6) other events occurring in the community which either affect or reflect the attitude of the community or individual jurors toward the defendant (such as the gathering of a hostile crowd outside the place where an accused person was being held[2]), and
(7) any other factors likely to affect the candor or veracity of prospective jurors.
Several of these factors were present, such as the seriousness of the crimes Wright was charged with and the release of information to the local press by police officials. These factors, however, are not of themselves sufficient to render a trial constitutionally unfair unless coupled with testimony of prospective jurors showing possible prejudice because of pretrial influences. There was no such showing. We again note, in finding that Wright's jury was fair and indifferent, that appellant's attorney approved of each juror and the two alternates and did not exhaust his peremptory challenges.

ASSIGNMENT NO. 2
In this assignment of error, Wright says he was twice put in jeopardy for the same offenses. At the initial trial, held on November 20, 21 and 22, 1989 in Edgard, the jury deliberated for approximately three hours and then informed the trial judge that it could not agree.
Supplemental instructions were given and the jury deliberated further, without any result. The jury foreman advised the trial judge that the jurors would like to be separated into two rooms and the trial judge granted this unusual request.
After being divided for less than five minutes, the jurors were reunited and deliberations continued. Eventually the foreman sent this note to the trial judge:
"Dear Sir, we cannot come up with 10 votes either way."
LSA-C.Cr.P. art. 775(2) states that a mistrial may be ordered in a jury case when jurors are unable to agree on a verdict. Here, it is clear that this jury could neither convict nor acquit. Rather than attempt to pressure the jurors into a verdict on the day before Thanksgiving, the trial judge properly declared a mistrial.
Concerning the separation of the jury, the record indicates that the jurors were divided for only a few minutes. During this time, they were sheltered from outside communications and/or influence.
The discharge of a jury is within the sound discretion of the trial judge. The exercise of such discretion is not ordinarily subject to review, particularly if the transcript shows, as it does in this instance, that the jurors simply could not reconcile their differences of opinion after five and a half hours of trying. Jeopardy did not attach and the state was free to try Wright again.

ASSIGNMENT NO. 3
Dr. Giles, according to Wright in this assignment of error, was allowed to testify about facts not within his personal knowledge, in violation of LSA-C.E. art. 602; and, further, he was permitted to testify on redirect about things not addressed in either direct or cross-examination. Art. 602 reads, in pertinent part:
"A witness may not testify to a matter unless evidence is introduced sufficient *764 to support a finding that he has personal knowledge of the matter. Evidence to prove personal knowledge may, but need not, consist of the testimony of the witness himself. This Article is subject to the provisions of Article 703, relating to opinion testimony by expert witnesses."
Art. 703 states:
"The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to him at or before the hearing. If of a type reasonably relied upon by experts in a particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence."
Comment (c) under Art. 703 is as follows:
"In contrast with lay witnesses, see Arts. 602 and 701, an expert witness may base his testimony on matters not within his personal knowledge, provided, of course, that the prerequisites set forth in this Article are met."
Dr. Giles is the scientific director of a DNA[3] testing facility in Dallas, Texas. He was qualified as an expert in microbiology and molecular biology. At considerable length, Dr. Giles, assisted by slides, explained the DNA testing procedure. He said that the sample of DNA taken from the victim's vagina matched Wright's DNA. Actually, according to Dr. Giles, Wright's DNA pattern is found in only one of every 1,878,000 black individuals.
While Dr. Giles, as Wright argues, did not personally conduct all of the tests, they were done under his close and direct supervision. He said:
"Well, I'm the expert from our company in regard to this kind of testing. It is my job to oversee all of the tests that are running at the company. I meet with the technicians on an ongoing basis to make sure that things are moving the way they should be. I supervise them on a daily basis. We have weekly and biweekly meetings where we, we go over each of the cases that are ongoing and what things are transpiring in those cases. It is then my role to analyze the data and to interpret the data to make a decision as to whether or not there is a match or a non match. And then I physically participate in the sizing of the DNA fragments using a computer. And then I also am involved on, I'm actually the person who in addition to sizing will get the probabilities by entering those into the computer as well ..."
"Well, we certainly want to be very careful. We do that, however, in every case, whether we believe that it's going to court or not. One of the things that's, that happens in all of our cases is that the technician keeps a daily log book of everything that's going on in a, in an analysis, and it is my job to review that. The technician will sign off on that page after she's finished it. It is my job then to review that page and reading it and understand everything that she's done. And I also sign off on that page and date it. And we do that in every case. And I must say that when cases are going to court we will, you know, comb those more carefully to make sure that we've done everything correctly. But, yes, we do that on a, on a ongoing basis for every case."
DNA testing is a relatively new prosecutorial device, in Louisiana and elsewhere. If, as was the case here, the expert witness is thoroughly qualified and provides well-documented testimony and evidence within procedural rules and guidelines, it is not error to submit such testimony and evidence to jurors. Dr. Giles' testimony and evidence did not offend either Art. 602 or Art. 703.
On redirect, appellant contends, Dr. Giles was allowed to address new facts not covered on direct. Our review of Dr. Giles' redirect shows very little and unimportant expanded testimony. Furthermore, defense counsel was not limited in his recross questioning. A trial judge has wide discretion in controlling redirect and recross examinations and his rulings are not disturbed on appeal absent abuse. Here, there was no abuse, particularly in *765 the absence of any restrictions placed on recross. See State v. Chapman, 410 So.2d 689 (La.1981); appeal after remand, 436 So.2d 451 (La.1983). See also LSA-C.E. art. 611(D), which states:
"A witness who has been cross-examined is subject to redirect examination as to matters covered on cross-examination and, in the discretion of the court, as to other matters in the case. When the court has allowed a party to bring out new matter on redirect, the other parties shall be provided an opportunity to recross on such matters."
Wright's attorney does not say that his recross questioning was prejudicially limited.

ASSIGNMENT NO. 4
This assignment of error relates to the identification of Wright by the store cashier. Immediately after the crimes, the victim told police that the person who had robbed and raped her was a black male standing 5'8" or 5'9" with a mustache. He was wearing, she said, a blue jeans jacket. When arrested, Wright, a black male, had on a blue jeans jacket. He had a full beard, not just a mustache, and is 6'1" tall.
Any defendant trying to suppress an identification must show both that the identification was suggestive and that there was a likelihood of misidentification. See State v. Prudholm, 446 So.2d 729 (La. 1984) and State v. Smith, 520 So.2d 1305 (La.App. 5 Cir.1988). In Manson v. Braithwaite, 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977), the Supreme Court of the United States addressed this issue, saying:
"The factors to be considered ... include the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of his prior description of the criminal, the level of certainty demonstrated at the confrontation and the time between the crime and the confrontation. Against these factors is to be weighed the corruptive effect of the suggestive identification itself."
The store cashier here described both her attacker and his car. The in-field confrontation took place shortly after Wright was arrested. The victim without hesitation identified Wright's automobile and then Wright himself. The cashier had ample opportunity to view Wright, both when the crimes were being committed and a short while later when he was returned to the store. Her identification was quick and positive.
Later that day, the victim was shown a photographic lineup. The photographs were of Wright and five other black males with facial hair, all about the same age. There were no distinguishing marks or characteristics. The cashier immediately picked out Wright. There is absolutely nothing in the record indicating that either the identification of Wright personally or the identification of him from the photographic lineup was suggested by police activity.
Instead, Wright bases most of his argument on the fact that the victim's initial description did not exactly match certain of Wright's physical characteristics. After being presented with all of the evidence concerning these discrepancies, along with other evidence, the jury found that Wright had been properly identified and was in fact the perpetrator. Otherwise stated, the jurors found the cashier's testimony creditable in spite of the fact that Wright was taller than initially described and had somewhat more facial hair than the victim remembered. These variances, assumably, were deemed of little or no consequence considering the totality of the evidence. The cashier's recall of Wright's physical makeup was generally accurate and her description of his auto was very precise. Also, Wright was apprehended speeding from the scene of the robbery and rape shortly after the crimes were committed. Any doubtful or inconclusive nature of an identification is a matter which goes to the weight rather than the admissibility of the testimony. See State v. Wright, 410 So.2d 1092 (La.1982).
This assignment of errors has no substance.

*766 ASSIGNMENT NO. 5
Here, Wright contends that his motion to quash the indictment because of the misconduct of public officials was wrongly denied. The L'Observateur article, which appeared on December 24, 1989, is entitled "Rape/robbery suspect out on bond." It was written by reporter Jill Ott and was based on information provided by Chief Oubre and Lt. Hay.
The article discussed Wright's prior criminal record and expressed police resentment over his release on bond. The story's last paragraph quoted Chief Oubre as sarcastically saying that the trial judge, by lowering Wright's bond and allowing him to be released, "... really gave the people a great Christmas present."
The motion to quash was heard on January 24, 1990 and denied on February 9, 1990.
While the actions of Chief Oubre and Lt. Hay may have been overreaching, they do not warrant a reversal. There is no suggestion that the District Attorney or any of his employees was in part responsible.
In any event, the December 24, 1989 article had no adverse or prejudicial effect on any of the 12 jurors or on either alternate juror.

ASSIGNMENT NO. 6
Wright complains because the trial judge did not read this requested charge:
"The testimony of a witness who has previously testified under oath, on one or more occasions, being subjected to both direct and cross-examination from the same parties on identical issues raised, who then in a subsequent proceeding, after being placed under oath, changes his or her testimony in a material way, such testimony should be carefully scrutinized and weighed, giving that testimony the weight it deserves."
This charge, according to appellant, was needed because a prosecution witness allegedly gave "altered testimony" and such testimony "... should be carefully scrutinized and weighed ..."
When Wright's attorney objected to the failure to read the requested charge dealing with credibility, the trial judge reread to the jury the following portion of the general charge covering credibility:
"Ladies and gentlemen, and it may be somewhat repetetive (sic), but in an over abundance of caution I am going to give you the following charge; you must determine whether or not a fact has been proven only from the evidence presented or from the lack of evidence. Evidence you should consider consists of the testimony of witnesses and of exhibits, such as writings and physical objects, which the Court permitted the parties to introduce. You must consider only evidence which was admitted during the trial. You may not consider evidence which you were instructed to disregard or to which an objection was sustained. As jurors you alone determine the weight and credibility of the evidence as the sole judges of the credibility of witnesses, and of the weight their testimony deserves. You should scrutinize carefully the testimony and the circumstances under which the witness has testified. In evaluating the testimony of a witness you may consider his or her ability and opportunity to observe and remember the fact about which he or she testified, his or her manner while testifying, any reason he or she may have for testifying in favor of or against the State or the defendant, and the extent to which the testimony is supported or contradicted by other evidence ..."
It appears that the requested charge was sufficiently included in the general charge. Further, failure to read a special charge constitutes reversible error only when there is a miscarriage of justice, prejudice to the substantial rights of the accused or a violation of a constitutional or statutory right. See State v. Pettaway, 450 So.2d 1345 (La.App. 2 Cir.1984), writs denied at 456 So.2d 171 (La.1984). There is no miscarriage of justice, prejudice or violation of any right involved in this assignment of error.

*767 ASSIGNMENT NO. 7
Wright was sentenced to 40 years at hard labor for forcible rape and 24 years for first degree robbery. He was also sentenced to 13 years and three months on each count pursuant to the multiple offender bill, LSA-R.S. 15:529.1. The sentences, totalling 90 years, six months, were ordered to be served consecutively.
In this assignment of error, Wright says (1) that his forcible rape sentence was excessive and (2) that he was not properly sentenced as a multiple offender.
Regarding (1), Wright cites State v. Lathers, 444 So.2d 96 (La.1983), wherein the defendant's 40-year hard labor sentence for forcible rape, to be served without parole, probation or suspension of sentence, was found excessive by the Supreme Court of Louisiana because the accused was young (20 years of age at time of the crime), a first offender, had a regular job and was financially supporting his three small children.
Wright's sentencing hearing was very brief. Although the trial judge mentioned a presentence investigative report, this document is not in the record. The trial judge did not articulate any reasons for imposing the 40-and 24-year sentences, as required by LSA-C.Cr.P. art. 894.1.
The multiple offender sentences were then imposed without any formal hearing. Wright was not informed of his right to be tried as to the truth of the multiple offender contentions and he was not given an opportunity to answer these allegations, as mandated by LSA-R.S. 15:529.1(D). See also State v. Easton, 463 So.2d 783 (La.App. 2 Cir.1985).
Accordingly, we vacate the sentence and remand to the district court for resentencing. The convictions are affirmed.
CONVICTIONS AFFIRMED, REMANDED FOR RESENTENCING.
NOTES
[1] This article is the only newspaper story in evidence.
[2] See State v. Leichman, 286 So.2d 649 (La. 1973).
[3] DNA stands for deoxyribonucleic acid, the genetic material found in all body cells.