565 So.2d 1055 (1990)
STATE of Louisiana
v.
Bobby GURLEY.
No. 88-KA-2130.
Court of Appeal of Louisiana, Fourth Circuit.
June 28, 1990.
*1056 Harry F. Connick, Dist. Atty., Val M. Solino, Asst. Dist. Atty., New Orleans, for plaintiff/appellee.
Sheila C. Myers, New Orleans, for defendant/appellant.
Before BARRY and WARD, JJ., and HUFFT, J. Pro Tem.
PRESTON H. HUFFT, Judge Pro Tem.
At approximately 9:00 p.m. on November 22, 1984, Catherine McGrath, Colleen Healy, and Helen Starks emerged from Miss Stark's car, parked off St. Charles Avenue on General Pershing Street in New Orleans, Louisiana. They had planned to meet Miss McGrath's boyfriend, Mark Posey, at Fat Harry's Bar on St. Charles Avenue. Miss McGrath had gone to the trunk of the car to retrieve an item from her purse when she was approached by a black man in dark clothing with a gun. He threatened to kill her if she did not give him her purse. Miss McGrath gave him her purse. The man then proceeded to fire a shot at the ground and threatened to shoot the other two girls if they did not give him their purses. They turned over their purses to him. He then walked to a bike at the corner and strapped the purse strings to the handlebars. The bike was a girl's model. At this time, Mark Posey, the victim, approached the scene from the direction of Fat Harry's Bar. Posey walked up to the perpetrator and they argued. The man got on his bike and began to pedal away as Posey continued to yell at him. The perpetrator then turned, fatally shot Posey, and rode away.
*1057 Posey's father, working in conjunction with a television reporter set up a reward fund for information concerning his son's murder. An informant contacted the television reporter, who in turn put the informant in touch with the police. Based upon information received from the informant the police set up surveillance of 3422 Freret Street where the defendant lived on December 3, 1984 at about 7:00 p.m. The defendant, upon becoming aware of the presence of the police, barricaded himself in the house. At 7:05 a.m. the next morning, the defendant emerged from the residence and surrendered. He was carrying a loaded gun which he placed on the front steps. The police seized and tested the gun and determined that it was the gun used to kill Posey. The defendant was then arrested for murder and a search warrant issued. Found inside his residence were a blue girl's bike, a navy blue knit cap, a box of .32 caliber bullets and a dark-colored jacket.
On December 7, 1984 two of the three witnesses to the crime, Catherine McGrath and Helen Starks, identified the defendant as the perpetrator in a physical line-up.
Defendant, Bobby Gurley, was charged, found guilty and sentenced to life imprisonment at hard labor without benefit of probation, parole or suspension of sentence for the murder of Mark Posey. Defendant has appealed, asserting six assignments of error.
A review of the record reveals no errors patent.
In his first assignment of error the defendant asserts that the trial court erred in denying his motion to disclose the identity of the reporter's informant as it violates the defendant's sixth amendment right to confrontation of his accusers.
In a television broadcast, the victim's father appeared with the reporter offering a reward for information leading to the arrest and conviction of Mark Posey's murderer. Shortly after the broadcast an informer called the reporter with information about the murder. Testimony at a hearing for a motion to suppress evidence revealed that the reporter put the informant in contact with the police. As a result of this conversation, surveillance was conducted by the police at the defendant's home. A motion to disclose the identity of the informant was denied by the trial court.
As a rule, the identity of a confidential informant who has given the police information concerning a crime is privileged and will be divulged only under exceptional circumstances. Roviaro v. United States, 353 U.S. 53, 77 S.Ct. 623, 1 L.Ed.2d 639 (1957); State v. Clouatre, 482 So.2d 106 (La.App. 4th Cir.1986). The burden of proving such circumstances lies with the defense, and much discretion is vested in the trial court's determination of whether the circumstances warrant disclosure. Clouatre, supra. Defendant in the case at hand has failed to meet this burden.
Defendant contends that he purchased the weapon after the murder and the informant may have either sold him the weapon or have information regarding its purchase. There was no other evidence to support this argument. State v. de la Beckwith, 344 So.2d 360 (La.1977), held that the defendant's mere suggestion that an informant may have himself participated in the crime and/or framed the defendant did not warrant disclosure of the informant's identity absent additional evidence in support of these contentions.
Thus, this assignment of error is without merit.
The defendant's second assignment of error asserts that the trial court erred in refusing to allow expert testimony on the psychological factors affecting reliability of eyewitness identifications.
The Louisiana Supreme Court in State v. Stucke, 419 So.2d 939 (La.1982), ruled against the admission of expert testimony relative to eyewitness identifications. The Court held as follows:
We conclude that the prejudicial effect of such testimony outweighs its probative value because of the substantial risk that the potential persuasive appearance of the expert witness will have a greater influence on the jury than the other evidence presented during the trial. Such *1058 testimony invades the province of the jury and usurps its function.
We therefore conclude that the trial court did not abuse his discretion in failing to allow the expert witness to testify. The testimony sought to be elicited from him would not have been an aid to the jury.
Other Louisiana decisions which have addressed this issue have relied upon the Stucke decision and found that the trial court did not abuse its discretion in refusing to allow expert testimony on the reliability of eyewitness identification. State v. Mims, 501 So.2d 962 (La.App. 2d Cir.1987); State v. Coleman, 486 So.2d 995 (La.App. 2nd Cir.1986), writ denied 493 So.2d 634 (La.1986).
Under Stucke, supra, and its progeny, the trial court did not abuse its discretion in refusing to allow expert testimony on the reliability of eyewitness identification.
In the third assignment of error, the defendant contends that the trial court erred in its refusal to declare a mistrial after the above refusal to admit expert testimony on eyewitness identifications.
The defense argues that because it had promised such an expert in its opening statement and was prevented by the ruling from calling the witness, the jury may have been prejudiced against the defendant. This argument, however, is without merit. There has been no showing of prejudice. Furthermore, the fact that the defense mentioned the calling of an expert during its opening argument, when the admissibility of this testimony had not been ruled upon, will not serve to compel the court to admit the testimony under the argument that to do otherwise would prejudice the defendant.
In the fourth assignment of error, the defense contends that the trial court erred in finding defendant competent to stand trial.
The trial judge appointed a sanity commission composed of Drs. Cox, Ritter and Medina to determine if defendant was competent to stand trial. Each doctor found the defendant competent and wrote a letter to the judge to that effect. Each doctor then testified regarding his examination and his conclusion regarding competency at the lunacy hearing conducted on August 28, 1985 and September 11, 1985.
Dr. Aris Cox performed a mental status examination on the defendant on January 30, 1985 and August 22, 1985. This examination considered the defendant's 1) general appearance and behavior, 2) alertness, 3) orientation, 4) thought process, 5) delusional belief or hallucinations, 6) mood and affect, 7) intelligence, 8) recall and memory, 9) judgment and, 10) ability to concentrate. Dr. Cox determined that defendant was of below normal to dull normal intelligence with normal memory. Dr. Cox had known the defendant for sometime from the defendant's prior hospitalizations at the Feliciana Forensic Unit. Based upon his dealings with defendant, whom he diagnosed as having an anti-social personality, he concluded that, while defendant sometimes had difficulty concentrating and talked about unrelated topics, he could be direct when he chose to be and could therefore assist in preparing his defense. He opined that defendant's occasional tendency to talk about unrelated topics and to not answer questions directly reflected the defendant's desire to control the interviews rather than an actual inability to focus.
Drs. Ritter and Medina also examined the defendant in January and August of 1985. Dr. Ritter, who had examined and found defendant competent to stand trial on prior occasions, testified that he had never found it difficult to understand the defendant, that the defendant told him during his examination that he could help his attorney and that he understood the concept of an alibi. Dr. Medina concurred with Dr. Ritter's findings.
The defense did not present testimony by a psychiatrist to contest the findings of the competency commission. It did, however, on cross-examination, challenge the findings of these three doctors based upon prior medical records of defendant, all dated more than two years prior to the occurrence of this crime. These records were *1059 from Feliciana Forensic Unit, Central City Mental Health Clinic, Earl K. Long Hospital and Charity Hospital. These records reveal numerous facts about the defendant:
1. had partial lobectomy in 1975 as a result of head injury sustained in jail when he was kicked in the head by another inmate.
2. taking meliril and thorazine in 1977,
3. affect "flattened" on 9/6/77,
4. diagnosed as hypomanic on June 5, 1981,
5. experienced seizures in October, 1981,
6. suicidal tendencies noted 6/6/83,
7. diagnosed as psychotic on 11/30/83,
The defense also introduced the record from another case, No. 260-876"J", where the defendant was found by the jury to be not guilty by reason of insanity in 1978.
In addition to the cross-examination of the sanity commission based upon these prior records, the defense had Ms. Cole, the defendant's former attorney, testify regarding the defendant's ability to assist in the preparation of his defense in case No. 260-876"J". Ms. Cole represented the defendant in 1978 when he was on trial in the above-referenced case and found not guilty by reason of insanity.
She testified that it was extremely difficult to communicate with the defendant. It was almost impossible to get specific dates, times or places from him. His thoughts were scattered. His answers to her questions were not responsive. He talked to her about irrelevant matters during the trial.
The defendant has the burden of proving by a preponderance of the evidence that he is incompetent, because of his mental infirmity, to stand trial. State v. Charles, 450 So.2d 1287 (La.1984). A defendant is mentally incompetent to stand trial when he lacks the capacity to understand the proceedings against him or to assist counsel in preparing a defense. State v. Narcisse, 426 So.2d 118 (La.1983), cert. denied 464 U.S. 865, 104 S.Ct. 202, 78 L.Ed.2d 176 (1983).
C.Cr.P. art. 641 defines "mental incapacity to proceed." It provides:
Mental incapacity to proceed exists when, as a result of mental disease or defect, a defendant presently lacks the capacity to understand the proceedings against him or to assist in his defense.
Various criteria should be considered in assessing a defendant's capacity to stand trial. These criteria were set forth in State v. Bennett, 345 So.2d 1129, 1138 (La.1977):
Appropriate considerations in determining whether the accused is fully aware of the nature of the proceedings include: whether he understands the nature of the charge and can appreciate its seriousness; whether he understands what defenses are available; whether he can distinguish a guilty plea from a not guilty plea and understand the consequences of each; whether he has an awareness of his legal rights; and whether he understands the range of possible verdicts and the consequences of conviction. Facts to consider in determining an accused's ability to assist in his defense include: whether he is able to recall and relate facts pertaining to his actions and whereabouts at certain times; whether he is able to assist counsel in locating and examining relevant witnesses; whether he is able to maintain a consistent defense; whether he is able to listen to the testimony of witnesses and inform his lawyer of any distortions or misstatements; whether he has the ability to make simple decisions in response to well-explained alternatives; whether, if necessary to defense strategy, he is capable of testifying in his own defense; and to what extent, if any, his mental condition is apt to deteriorate under the stress of trial. See, State v. Augustine, supra [252 La. 983, 215 So.2d 634 (1968) ]; Robey, Criteria for Competency to Stand Trial: A Checklist for Psychiatrists, 122 Am.J. of Psychiatry, at 616: Note, 6 Loyola Univ.L.J. at 684-85; Note, 4 Columb. Hum.Rights L.Rev. at 245.
The foregoing factors are "guidelines" to assist the court in rendering a decision on *1060 defendant's competency. Narcisse, supra, at page 128. A trial court's determination of capacity to stand trial is entitled to great weight. State v. Morris, 340 So.2d 195 (La.1976). On appeal it will not be overturned absent clear abuse of discretion. State v. Bickham, 404 So.2d 929 (La.1981); State v. Dorsey, 447 So.2d 636 (La.App. 1st Cir.1984).
In this case, the defense has not demonstrated that the defendant was incompetent to stand trial. The medical reports submitted to contradict the sanity commission hearing were not current and defendant did not file a motion for additional testing. The testimony of his prior counsel referred to the defendant's behavior during a 1978 trial. Moreover, the weight to be given the previous attorney's testimony is questionable.
In State v. Rogers, 419 So.2d 840, 842 (La.1982), the Supreme Court noted that such lay witness testimony concerning a previous case "did not result from objective expert analysis of the defendant's present mental capacity to stand trial ... and was not based on tests or interviews designed to gather information pertinent to such an inquiry."
The defense did not present current psychiatric expert testimony to challenge the unanimous finding of the sanity commission. This assignment of error has no merit.
In the fifth assignment of error, the defense contends that the trial court erred in denying the defendant the right to fully question the members of the sanity commission about defendant's seizures.
The first time this issue came up at the sanity hearing was in the defense's cross-examination of Dr. Cox when the defense asked Cox if he remembered if the Feliciana Medical Records documents reflected that defendant had seizures. Cox responded that he did not remember. He then stated that he did remember that defendant, while at Feliciana, was placed on antipsychotic drugs for seizures for a while. The defense did not explore the issue further and moved on to another topic.
The next time the issue came up was later in the cross-examination of Dr. Cox. Dr. Cox, in reviewing defendant's past medical records, testified that Dr. Franklin diagnosed the defendant in 1981 as having a schizo-affective psychosis and having grand mal seizures. The court then asked Dr. Cox if the seizures had anything to do with defendant's continuing mental ability. Dr. Cox responded "no". The court then said that any further testimony on the issue of defendant's seizures was irrelevant.
The defense objected, arguing that under State v. Coco, 371 So.2d 803 (La.1979), information regarding the seizures was pertinent to determine if, at trial, medical personnel should be present to monitor the defendant in case he had a seizure. The court then informed the defense that if it requested that medical personnel be provided to monitor defendant at trial, its request would be granted, but that any further testimony regarding defendant's seizures was unnecessary. The defense thus did not question the other two doctors about this issue. The only other reference to this issue was the defense's introduction into evidence of an Orleans Parish Prison record that indicated that the defendant had had a seizure while incarcerated for the present offense on February 5, 1985. The court found the defendant competent to stand trial, the defendant did not bring a motion for additional testing or take writs on the trial court's ruling that defendant was competent. Moreover, the defense, at trial, did not request the presence of medical personnel to monitor defendant nor is there any allegation that defendant suffered a seizure at trial.
If a defendant is indigent, as here, and forced to rely exclusively upon the findings of a court-appointed sanity commission rather than a private physician of his choice, he is entitled to a thorough examination, and ought not to be responsible for any lack of diligence by the appointed commission in examining him. State v. Coco, 371 So.2d 803 (La.1979).
However, since the defendant has the burden of proving his incapacity to proceed, he must demonstrate that further *1061 testing for seizures would have resulted in evidence that the seizures rendered the defendant incapable of standing trial. See for example, State v. Colvin, 452 So.2d 1214 (La.App. 2nd Cir.1984), writ denied 457 So.2d 1199 (La.1984).
In this case, the medical records indicate that the defendant had seizures in 1981 and one in 1985. Dr. Cox testified that the seizures did not affect defendant's continuing mental ability. The court concluded that the defendant would obviously not be competent during a seizure, but would be competent otherwise. Under these facts, the defense has not demonstrated that additional testing for seizures was necessary or that the trial court erred in limiting its cross-examination of Dr. Cox on this issue. Thus, this assignment of error is without merit.
In the sixth assignment of error, the defense contends that the trial court erred in denying its motion to suppress the identification. It alleges a likelihood of misidentification was created 1) because the three witnesses to the crime collobrated with a police artist to draw a composite sketch of the perpetrator making it impossible to obtain independent identifications of the perpetrator by each witness and, 2) because the eyewitnesses to the murder watched on television the defendant being arrested for the Posey murder prior to identifying the defendant as the perpetrator at the physical line-up. It lastly alleges that the motion to suppress the identification should have been granted because the trial court did not allow into evidence expert testimony on the credibility of eyewitness identification. Since this last issue has already been addressed, supra, in Assignments 2 and 3, it will not be considered here.
To address the two prior arguments, that there was a likelihood of misidentification because of the collaboration of the three eyewitnesses in putting together a composite sketch of the perpetrator and because the eyewitnesses saw the defendant on television before the physical line-up, the particular facts surrounding the identification process are summarized below.
The crime occurred on a well-lit street on the night of November 22, 1984. Each of the eyewitnesses saw the defendant from several feet away for about three minutes. Each described the perpetrator to the police immediately after the crime as being a black man with little or no facial hair wearing a black dark knit cap pulled down below his eyebrows and a dark jacket and riding a girl's bicycle.
Several days after the crime occurred, on November 30, 1984, the three girls went down to the police station where they worked together with an artist to draw a composite sketch of the perpetrator. The girls looked at various pictures of each component of a face (eyes, ears, nose, lips) and picked that picture that most closely resembled the defendant. These various components were combined by the artist to produce a portrait.
On December 4, 1984 the defendant was arrested after he had barricaded himself in his residence at 3422 Freret Street. The police had decided to surveil defendant's house based upon information obtained from the informant referred to them by the television reporter. Thus, the composite picture completed by the girls several days earlier had nothing to do with locating the perpetrator.
The defendant's surrender was televised. All three girls saw the footage. However, each testified that they could not see the defendant's face because he held it down before the cameras and that their viewing the defendant on television had no impact on their subsequent identification of him as the perpetrator at the physical line-up.
The physical line-up was held on December 7, 1984. All three girls attended. Each was told prior to the line-up to sit apart from the others and not to talk or gesture to each other once the line-up began. Each testified that the police did not tell them that they had to identify anyone. The defendant and five "look-alikes," were in the line-up. After the line-up was over and before the girls could talk to one another, each was interviewed separately. *1062 Catherine McGrath and Helen Starks positively identified the defendant, No. 1 in the line-up, as the perpetrator.[1] Each testified at trial that their observation of defendant's arrest on television had no effect on their identification of him in the physical line-up because they did not see defendant's face itself on television because the defendant was looking down.
To suppress an identification, a defendant must prove both the identification itself was suggestive and that there was a likelihood of misidentification as a result of the identification procedure. State v. Smith, 499 So.2d 340 (La.App. 4th Cir. 1986), writ denied 503 So.2d 14 (La. 1987).
The five factors employed in determining the likelihood that an identification procedure resulted in misidentification are set forth in State v. Prudholm, 446 So.2d 729, 738 (La.1984), citing Manson v. Brathwaite, 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977);
In Manson, the court considered these five factors in determining whether the identification was suggestive: (1) the witness's opportunity to view the defendant at the time the crime was committed; (2) the degree of attention paid by the witness during the commission of the crime; (3) the accuracy of any prior description; (4) the level of the witness's certainty displayed at the time of identification; and (5) the length of time elapsed between the crime and the identification.
In this case, the fact that the girls collaborated to help an artist draw a composite sketch of defendant is irrelevant since the composite sketch was never relied upon to identify the defendant. He was initially discovered through information given by the informant referred to the police by Ron Hunter.
The only remaining issue is thus whether the fact that the girls saw the defendant on television prior to their identification of him in the physical line-up tainted the identification of the defendant. They testified that they did not see the defendant's face because he hid it, by looking downward, from the cameras. Consequently, they testified that that had no bearing on their identification of him at the physical line-up. Additionally, the jury was allowed to see the television clip at issue. Therefore we believe that the trial court was not in error in denying the defendant's Motion To Suppress Identification. Additionally, the jury was allowed to see the television clip at issue.
Moreover, considering the Manson supra, factors, the witnesses observed the perpetrator at close range on a well-lit street for three minutes. The description they gave of him to the police matched the defendant. The witnesses were confident of their identification of him at the physical line-up. Only two weeks had elapsed between the crime and the identification. Under these circumstances, the trial court did not err in denying defendant's motion to suppress the identification. Thus, this assignment of error is without merit.
The defendant's conviction is affirmed.
AFFIRMED.
NOTES
[1] Colleen Healey testified at trial that she could not see Nos. 1 and 3 during the line-up, but failed to tell the police until the line-up was over. She tentatively identified No.2, Reginald Jackson, as the perpetrator.