696 So.2d 599 (1997)
STATE of Louisiana
v.
Willie PARKER.
No. 96-KA-1852.
Court of Appeal of Louisiana, Fourth Circuit.
June 18, 1997.
*600 Harry F. Connick, District Attorney of Orleans Parish, Richard R. Pickens, Assistant District Attorney of Orleans Parish, New Orleans, for Plaintiff/Appellee.
Laurie A. White, Law Office of Laurie A. White, New Orleans, for Defendant/Appellant.
Before BYRNES, JONES and WALTZER, JJ.
JONES, Judge.
Defendant Willie Parker was indicted by the grand jury for the first degree murder of Paul Gernhauser. Defendant's pretrial motions were denied by the trial court. A twelve member jury found him guilty as charged, but was unable to agree as to the sentence to be imposed. By law he was sentenced to life imprisonment. He appeals. Defendant filed motions for discovery and suppression, which were heard on October 20, 1995. The trial court denied the motion to suppress the defendant's statements, and continued the hearing as to the motion to suppress the identification. The hearing on the motion to suppress the identification was held on November 20, 1995, and denied. After a two day jury trial, the defendant was found guilty as charged on February 29, *601 1996. The penalty phase of the trial began on March 1, 1996. After the jury informed the trial court that it was deadlocked, the trial court declared a mistrial, and on May 1, 1996, the defendant was sentenced to life imprisonment at hard labor without benefit of parole, probation or suspension of sentence.

STATEMENT OF FACTS
Paul Gernhauser was found dead in his garage at 11:30 p.m. on June 30, 1995. He had been struck at least four times in the back of his head with a heavy bar-like object.
Jan Ezell testified she had visited with her father, Paul Gernhauser, on June 30, 1995. She left his house around 12:30 p.m., and was to see him that evening at her daughter's baseball game. Ms. Ezell testified her father always kept paper and a pen in his front shirt pocket. When her father did not show up at her daughter's game, Ms. Ezell was not worried. She thought her father may have stopped to visit her brother. After the baseball game, Ms. Ezell went home and started packing for a family vacation trip. She called her father's house four to five times without receiving an answer. When she called at 11:00 p.m. and her father did not answer, she became worried. Ms. Ezell's husband, Chris Ezell, went to check on his father-in-law. Her husband called her around 11:30 p.m. and told her to come to her father's house. He told her that he thought her father was dead. When she arrived at her father's house, the police were there. They would not let her see her father's body. That night, she walked through the house with the police detectives. She noted that her mother's green jewelry box and some jewelry was missing. Her father's watch, wallet and keys were also missing.
The next day Ms. Ezell called to report her father's credit cards as missing. When she called VISA, she was informed that someone had attempted to use the credit card at several local ATM machines. Ms. Ezell asked the person with VISA, Ruth Hooker, to call the Homicide Office of the New Orleans Police Department.
Ms. Ezell further testified that her father and mother had been married for fifty-three years when her mother passed away in March of 1993. They had four children, two boys and two girls. Ms. Ezell stated that her father was very involved in his children's and grandchildren's lives.
Chris Ezell went to his father-in-law's house around 11:30 p.m. after his father-in-law did not respond to their phone calls. When Mr. Ezell arrived at the house, he noticed that lights were on in the den and the kitchen. He used his wife's keys to enter the house. He called for Mr. Gernhauser but received no answer. When he walked into the bedroom, he noticed some of the drawers were open. Mr. Ezell then went to the back of the house. The back door and iron gate were unlocked. He looked in the garage and saw Mr. Gernhauser lying on the ground face down. Ezell went into the house and called 911. He thought Mr. Gernhauser had a heart attack. He then returned to the garage and opened the garage door. When he approached Mr. Gernhauser, he saw blood on the ground and observed that the victim had a big hole in the back of his head. He also noted that rigor mortis had set in. Mr. Ezell returned to the house and again called 911, requesting the police. He then notified his wife and her siblings. The police arrived shortly thereafter.
New Orleans Police Officer Robert Kelley was one of the first officers to respond to the call. He arrived at the scene before the emergency medical unit. When the EMS unit arrived, they examined the victim and told the officer that the victim was dead. Officer Kelley then called the dispatcher and requested the homicide unit. Officer Kelley spoke with Chris Ezell and secured the scene for the homicide detectives and the crime lab.
Norland Stafford, who lives on Paris Avenue, stated that he was walking to the bus stop at the corner of Paris and Prentiss around 3:00 p.m. on June 30, 1995. As he passed Mr. Gernhauser's house, he saw Mr. Gernhauser speaking to another man by the garage. He noted that they were not arguing. Stafford described the unidentified man as Afro-American, 5'7"-5'8", 30-45 years old and wearing work khakis, a tee shirt and a baseball type cap. Stafford provided the police *602 with a description on July 1, 1995, the day after the murder. The police had been canvassing the neighborhood to ascertain if there were any witnesses. A few weeks later, the police asked the witness to review a photographic lineup. The witness selected the defendant's photograph as the person who most closely resembled the man the witness had seen talking to Mr. Gernhauser. However, Mr. Stafford could not make a positive identification.
Officer Karl Palmer of the crime lab photographed the scene and collected evidence which included computer paper, a drinking glass, a metal plant stand which had blood on it, the victim's eyeglasses, a pen and a rust colored toothbrush. The paper and pen were found under the victim's left arm. The papers had two names and addresses written on them, one of which was the victim's name and address. The other sheet of computer paper had the name "Tim Baker", an address and a telephone number written on it.
Officer Tim Seuzeneau, a forensic light examiner with the Crime Lab, processed the crime scene for latent fingerprints on July 1, 1995 at the request of Detective Caprera. There was a latent fingerprint on the bottom of a tin box in the victim's bedroom. However, no identification was made of that print. The drinking glass and the victim's eyeglasses were processed with negative results. Two partial fingerprints were developed on the computer paper which had the name "Tim Baker" written on it. The officer also found a toothpick in the bedroom. The toothpick was examined for saliva but none was found to be present.
Dr. Paul McGarry, a forensic pathologist with the New Orleans Coroner's office, conducted an autopsy on the victim. The cause of death was four blows to the back of the head that crushed the skull and drove bone and tissue into the brain. There were also injuries to the front of the head and face. The victim had bruises over his forehead and eyebrows. There were cuts on the left side of his nose and cheek, upper lips, lower lips and chin. The victim's left index finger was also fractured. Dr. McGarry opined that the weapon was a heavy straight bar-like object, like a pipe or heavy club-like piece of wood.
Ruth Hooker, a fraud investigator with Bank One in Lafayette, Indiana, testified that she spoke with Jan Ezell in July of 1995 concerning the victim's credit cards. She noted that several transactions were attempted on the victim's VISA credit card. The transactions were unsuccessful as the person did not have the correct personal identification number. Nine transactions were attempted within a five hour period beginning at 7:11 p.m. on June 30, 1995 through 12:07 a.m. on July 1, 1995. The witness informed Detective Caprera of the times and locations of the transactions.
Emmett White, general manager of Louisiana Industries, a cement company, was the defendant's employer. The defendant drove a Ready Mix truck. He had worked for Louisiana Industries for two years. Mr. White testified he called the police after viewing the defendant's photograph in the July 14, 1995 edition of the Times-Picayune. White also stated that according to their work records, the defendant took a personal day on June 30, 1995.
The defendant's girlfriend, Bernadine Williams, testified that she allowed the defendant to drive her Volkswagen Jetta. In fact, the defendant had the car on June 30, 1995. She did not know whether the defendant went to work on June 30, 1995. At approximately 7:00 p.m. on July 14, 1994, several police officers came to her house and informed her that they believed her vehicle was used in a crime. They intended to impound her car. When she told the officers that the defendant was present in the house, they went into the back room and arrested him. Several hours later, the officers returned with a search warrant. The officers searched the bedroom she shared with the defendant. The officers found a green jewelry box and some jewelry that did not belong to her or anyone in her family. She stated she had never seen the jewelry box.
Homicide Detective Anthony Caprera was assigned to investigate the murder of Paul Gernhauser. When he arrived at the scene at 11:45 p.m., he observed the victim. The victim appeared to have been dead for several *603 hours as rigor mortis was fully present. He noted the victim had sustained a large injury to the top of his head. He interviewed family members and secured the scene for the night. Detective Caprera returned the next day to process the house for evidence. Some jewelry, a green jewelry box, and the victim's wallet, watch and keys were missing. Several other police officers canvassed the neighborhood for possible witnesses. Officers Ronquillo and Waguespack spoke with Norland Stafford. Detective Caprera was informed by the victim's daughter, Jan Ezell, that someone attempted to use the victim's credit card on the evening of June 30, 1995. Detective Caprera spoke with Ruth Hooker of Bank One and obtained the times and locations of the attempted transactions. The transactions occurred at four different locations: First National Bank of Commerce at the corner of Carrollton and South Claiborne at 7:11 p.m.; Regions Bank at Elysian Fields and Gentilly Boulevard at 7:53 p.m.; Liberty Bank in the 3000 block of Gentilly Boulevard at 8:07 p.m.; and Boomtown Belle Casino in Harvey, Louisiana at 12:07 a.m. on July 1, 1995. The officer contacted the banks and requested to view their ATM videotapes. The videotapes showed that the perpetrator was an Afro-American male and drove a Volkswagen Jetta. He obtained still photographs and compiled a news release that was broadcast on the local television stations and published in the Times-Picayune. The day after the news release was broadcast, the officer received a phone call from Mr. White who identified the defendant as the person in the photograph. Mr. White provided the officer with the defendant's phone number. The phone number was registered to a residence on Erato Street.
Detective Caprera then went to the Erato Street address to impound the vehicle. He spoke with Bernadine Williams and learned that she was the owner of the vehicle. He informed her that they were going to impound the vehicle for a while as the vehicle was believed to have been used in a crime. When Ms. Williams told him that the defendant was in the residence, the officer proceeded to locate the defendant in the residence and arrested him. The officer advised the defendant of his rights and informed him that he was under arrest for murder. When they arrived at the homicide office, the defendant was taken into the interview room. Detective Caprera reviewed a rights of arrestee form with the defendant and again advised the defendant of his rights. The defendant stated he understood his rights and that he was being charged with murder. Detective Caprera asked the defendant if he had used someone's credit card. The defendant admitted using the credit card. The defendant told the officer that he found the credit card in the street by the Winn-Dixie in the 500 block of North Carrollton Avenue. The card was lying on the street by itself. He tried to use the card at the ATM at the Winn-Dixie and then went home. The defendant stated he had to get home by 6:00 p.m. so his girlfriend could use her car. Detective Caprera then questioned the defendant about the photographs at the different ATM locations. The defendant had no reply. He started shaking and crying. The defendant denied knowing or killing the victim. He told the officer that he just attempted to use the credit card which he found on the street. The defendant then began to change his story. He stated that he could not go to work that day because his car had a flat tire.
After interviewing the defendant, Detective Caprera applied for a search warrant of the Erato Street address. Upon executing the search warrant, the officers found a green jewelry box, some jewelry, the defendant's clothes, and a newspaper clipping of the defendant's photograph from the July 14, 1995 edition of the Times-Picayune. The victim's family identified the jewelry and jewelry box as belonging to the victim and their deceased mother. Detective Caprera subsequently prepared a photographic lineup for Norland Stafford to view. Mr. Stafford could not positively identify the defendant but stated that the defendant closely resembled the person he saw talking to the victim on June 30, 1995.
Several days later Officer Raymond Loosemore of the Criminal Records Division compared the defendant's fingerprints with the fingerprints found on the computer paper. The defendant's fingerprints were found to match the fingerprint found on the computer *604 paper. Officer Glen Burmaster of the Latent Fingerprint Unit verified Loosemore's comparison and identification of the defendant's fingerprint.
James Kenney, the defendant's immediate supervisor at Louisiana Industries, testified the defendant was required to wear a uniform to work. The uniform consisted of a light blue shirt and dark blue pants. Kenney does not recall if the defendant worked June 30, 1995 or July 2, 1995. However, the defendant's time card indicates the defendant took a personal day on June 30, 1995.
At approximately 10:30 a.m. on June 30, 1995, Constance Turner and her husband, Lloyd Turner, were in Winn-Dixie when they saw the defendant. Her husband is the defendant's cousin. The defendant told her husband that his car would not start and asked if her husband would help him. While she stayed in the grocery, the defendant and her husband went to check on the vehicle. Subsequently, the defendant and her husband returned. The defendant left the grocery with her and her husband. They went back to their house. The defendant had lunch with them. After lunch, the defendant took a nap at their house. Around 6:00 p.m. that evening, the defendant and her husband went to work on the defendant's car. The defendant left their house at approximately 6:30 p.m. Ms. Turner stated she recalled that the incident occurred on June 30, 1995 as her husband had gotten paid that day, as he was paid every other Friday. The next day, she and her husband found out that the defendant was wanted by the police. They saw the newspaper with the defendant's photograph in it. The newspaper was dated July 14, 1995. On cross-examination, Ms. Turner stated that the incident could have occurred on July 14, 1995. Mr. Turner acknowledged the defendant likes to gamble.
Bernadine Williams testified on the defendant's behalf. She stated the defendant left her house at approximately 7:00 a.m. on June 30, 1995. He was wearing his work uniform. The defendant did not return until noon on Saturday, July 1, 1995. When he returned on Saturday, he was still wearing his uniform. The uniform was soiled but there was no blood on it. The witness saw the defendant's photograph on the television on July 13, 1995 and called the Turners to inform them. Ms. Williams testified the defendant would go to the casinos three to four times a week.
The defendant testified that he was scheduled to work on June 30, 1995 but called in because he was having car trouble. One of the tires was flat. He got the tire repaired at approximately 9:30 a.m. He was on his way to the casino when the tire blew again and then the car would not start. He walked to his cousin's (i.e., Lloyd Turner) house for help but he was not home. As he passed Winn Dixie, he saw Turner's van in the parking lot. He went into the grocery looking for Turner. When he found Turner, he told Turner of his predicament. He and Turner went to look at the car. When they realized the car had overheated, they rejoined Turner's wife in the grocery. The defendant left Winn Dixie with the Turners and went to their house. He had lunch with the Turners. After lunch, he took a nap. Later that afternoon, he and Turner worked on the car. They were able to get the car started and repaired the tire. He left Turner's house around 6:30 p.m. After leaving Turner's house, he went to the Winn Dixie to purchase a pack of cigarettes. When he got out of the car, he saw a bag lying on the ground. The bag contained a green jewelry box and a credit card. He attempted to use the credit card at three or four different locations. The defendant denied any involvement in the victim's murder. He stated he did not know the victim and was not in the victim's neighborhood on June 30, 1995. He acknowledged he would go to the casinos three to four times a week.
A review of the record for errors patent reveals none.

Assignment of Error No. 1
In his first assignment of error, the defendant contends the trial court erred in denying his motion to suppress the tentative identification made by Mr. Stafford. The defendant argues Mr. Stafford's identification was influenced by the defendant's photograph in the Times-Picayune.
*605 In order to suppress an identification, a defendant must prove that the identification itself was suggestive and that there was substantial likelihood of misidentification as a result of the identification procedure. State v. Gurley, 565 So.2d 1055, 1062 (La.App. 4th Cir.1990), writ denied, 575 So.2d 386 (La. 1991); citing, State v. Smith, 499 So.2d 340 (La.App. 4th Cir.1986), writ denied, 503 So.2d 14 (La.1987). Five factors are to be considered in determining the likelihood of misidentification as a result of the identification procedure as outlined in State v. Prudholm, 446 So.2d 729, 738 (La.1984), citing Manson v. Brathwaite, 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977):
In Manson, the court considered these five factors in determining whether the identification was suggestive: (1) the witness's opportunity to view the defendant at the time the crime was committed; (2) the degree of attention paid by the witness during the commission of the crime; (3) the accuracy of any prior description; (4) the level of the witness's certainty displayed at the time of identification; and (5) the length of time elapsed between the crime and the identification.
If the reviewing court finds that there existed an element of suggestiveness, the court must then decide, under all the circumstances, if the suggestive procedure gave rise to a substantial likelihood of misidentification, or whether the indicia of reliability demonstrates that the identification is accurate. Manson, supra; Prudholm, supra; State v. Holmes, 550 So.2d 249, 251 (La.App. 4th Cir.1990), writ denied, 556 So.2d 56 (La.1990); State v. Valentine, 570 So.2d 533, 535 (La.App. 4th Cir.1990). The trial court's determination on the admissibility of identification evidence is entitled to great weight and will not be disturbed on appeal in the absence of an abuse of discretion. State v. Bickham, 404 So.2d 929 (La. 1981).
In the case at bar, Mr. Stafford testified he could not make a positive identification of the defendant. Mr. Stafford testified at the suppression hearing and at trial that he selected the photograph which most "closely resembled" the person he observed speaking with the victim on the afternoon of June 30, 1995. Further, the tentative identification was neither suggestive nor unreliable. The defendant argues Mr. Stafford was influenced by the defendant's photograph in the Times-Picayune. However, Mr. Stafford testified at trial that he was not influenced by the newspaper photograph. Mr. Stafford and Detective Caprera testified as to the procedures used in the photographic lineup. The officer did not suggest to Mr. Stafford which photograph he should select. Neither witness indicated Mr. Stafford was forced or coerced into making a tentative identification. Further, Mr. Stafford's description of the person he saw talking with the victim was very specific and matched the defendant. Mr. Stafford provided the description to the officers the day after the murder and two weeks prior to defendant's photograph appearing in the Times-Pacayune. Mr. Stafford described the person as an Afro-American male, 30-45 years old, and 5'7" to 5'8" with a medium build. The person had a moustache and was wearing khaki pants, a white tee shirt and a baseball cap. Mr. Stafford indicated that he observed the person and the victim for several minutes as he walked from his house to the bus stop at the corner of Paris and Prentiss. Mr. Stafford also stopped and waived hello to the victim. The witness stated he saw the subject and the victim around 3:00 p.m. The day was clear and his vision was not obscured. Mr. Stafford testified the subject and the victim were standing by the hedges near the victim's garage. While he had only a back and side view of the victim, he had a full view of the subject as the subject was facing his way. The totality of the circumstances reveals the defendant's tentative identification was not unreliable. The trial court did not err when it denied the defendant's motion to suppress the identification.
This assignment is without merit.

Assignment of Error No. 2
The defendant also argues the trial court erred in denying his motion to suppress the oral statements the defendant made to the police after his arrest.
*606 The State has the burden of proving that a statement given by a defendant was freely and voluntarily given, not the product of threats, promises, coercion, intimidation, or physical abuse. La.R.S. 15:452; State v. Seward, 509 So.2d 413 (La.1987); State v. Brooks, 505 So.2d 714 (La.1987), cert. den. Brooks v. Louisiana, 484 U.S. 947, 108 S.Ct. 337, 98 L.Ed.2d 363 (1987); State v. Daliet, 557 So.2d 283 (La.App. 4th Cir.1990). To establish the admissibility of a statement made by an accused person during custodial interrogation, the State must prove that the accused had been advised of his/her Miranda rights and that he/she waived these rights prior to interrogation. Brooks; Daliet. The "failure to obtain the accused's signature on a written Miranda waiver does not mandate a determination of involuntariness in deciding whether a confession or inculpatory statement is admissible." State v. Turnbull, 377 So.2d 72, 74 (La.1979). A waiver of Miranda rights need not be explicit but may be inferred from the actions or words of the accused. An express or oral waiver of rights is strong proof of the validity of the waiver. North Carolina v. Butler, 441 U.S. 369, 99 S.Ct. 1755, 60 L.Ed.2d 286 (1979); State v. Samuels, 94-1408 (La.App. 4th Cir. 6/7/95) 657 So.2d 562. The determination of a statement's admissibility is within a trial court's discretion, and it should not be disturbed unless it is not supported by the evidence. Brooks; Daliet.
Detective Caprera testified at the suppression hearing and at trial that he initially advised the defendant of his rights upon arrest. After arriving at the homicide office, Detective Caprera reviewed a rights of arrestee form with the defendant and explained to the defendant his Miranda rights and the charge against him. The defendant stated he understood his rights and the charge against him. The defendant was not forced, coerced or offered anything to make a statement. The officer stated that he posed some questions to the defendant and the defendant voluntarily answered them. The defendant did not produce any evidence at the suppression hearing or at trial to contradict or rebut the officer's testimony concerning the voluntariness of the statements. As the evidence indicates the defendant was advised of his rights and gave a statement to the police without being coerced, forced or offered anything for the statement, the trial court did not err when it denied the defendant's motion to suppress his confession. The evidence presented by the state reveals the defendant freely and voluntarily gave a statement to the police.
This assignment is without merit.

Assignment of Error No. 3
Defendant further contends that his trial counsel was ineffective. He alleges his counsel was ineffective for (1) failing to recuse the trial judge; (2) waiving opening statement; (3) failing to effectively cross-examine Detective Caprera concerning the free and voluntary nature of the defendant's statement; (4) failing to object to the state's use of defendant's inculpatory statements in its opening statement; (5) failing to sufficiently cross-examine Norland Stafford; (6) failing to object to the admission of evidence of other crimes; and (7) failing to object to the jury's viewing of the autopsy protocol during deliberations.
Generally, the issue of ineffective assistance of counsel is a matter more properly addressed in an application for post conviction relief, filed in the trial court where a full evidentiary hearing can be conducted. State v. Prudholm, 446 So.2d 729 (La.1984); State v. Johnson, 557 So.2d 1030 (La.App. 4th Cir. 1990) State v. Reed, 483 So.2d 1278 (La.App. 4th Cir.1986). Only if the record discloses sufficient evidence to rule on the merits of the claim do the interests of judicial economy justify consideration of the issues on appeal. State v. Seiss, 428 So.2d 444 (La.1983); State v. Ratcliff, 416 So.2d 528 (La.1982); State v. Garland, 482 So.2d 133 (La.App. 4th Cir. 1986); State v. Landry, 499 So.2d 1320 (La. App. 4th Cir.1986).
The defendant's claim of ineffective assistance of counsel is to be assessed by the two part test of Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); State v. Fuller, 454 So.2d 119 (La. 1984). The defendant must show that counsel's performance was deficient and that the deficiency prejudiced the defendant. Counsel's *607 performance is ineffective when it can be shown that he made errors so serious that counsel was not functioning as the "counsel" guaranteed to the defendant by the Sixth Amendment. Strickland, supra at 686, 104 S.Ct. at 2064. Counsel's deficient performance will have prejudiced the defendant if he shows that the errors were so serious as to deprive him of a fair trial. To carry his burden, the defendant "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland, supra at 693, 104 S.Ct. at 2068. The defendant must make both showings to prove that counsel was so ineffective as to require reversal. State v. Sparrow, 612 So.2d 191, 199 (La.App. 4th Cir. 1992).
The defendant suggests his trial counsel was ineffective for failing to move to recuse the trial judge when he became aware that the trial judge knew the victim's nephew. The trial judge informed the defendant and counsel at the arraignment that he knew the victim's family. At that time, defense counsel indicated he would discuss the issue with the defendant and may file a motion for recusal. Such a motion was never filed by the defendant. At trial, the trial judge stated that while he knew the victim's nephew he was "not good friends with the victim's family."
The trial judge is presumed to be impartial. State v. Edwards, 420 So.2d 663 (La.1982). For a defendant to be entitled to the recusation of a trial judge on the grounds of bias or prejudice such must be of a substantial nature based on more than conclusory allegations. Id.; State v. Walton, 469 So.2d 1204 (La.App. 4th Cir.1985) La.C.Cr.P. article 671 does not require the recusal of a trial judge simply on the basis that the trial judge knew the victim's family. Thus, it does not appear that the defendant in the present case was entitled to the recusal of the trial judge. Appellate counsel has produced no evidence to support allegations that the trial judge was bias or prejudiced.
Even assuming trial counsel was ineffective in failing to file a motion for recusal, the defendant has produced no evidence to indicate the failure to file a motion for recusal caused prejudice to the defendant. A review of the trial transcript reveals the trial judge was impartial and objective in his rulings. He provided the jury with the appropriate instructions on the law to be applied to the case.
The defendant also argues trial counsel was ineffective when he waived the opening statement. Under La.C.Cr.P. article 765, a defendant may waive his opening statement. In order to prevail on a claim of ineffective assistance of counsel, the defendant must show the failure of trial counsel to make an opening statement resulted in specific prejudice. If an alleged error results from a reasonable strategic decision, it does not establish ineffective assistance of counsel. State v. Brooks, 94-2438 (La. 10/16/95), 661 So.2d 1333. Moreover, as "opinions may differ on the advisability of a tactic, hindsight is not the proper perspective for judging the competence of counsel's trial decisions. Neither may an attorney's level of representation be determined by whether a particular strategy is successful." State v. Brooks, 505 So.2d 714, 724 (La.1987), cert. denied, Brooks v. Louisiana, 484 U.S. 947, 108 S.Ct. 337, 98 L.Ed.2d 363 (1987).
In the case at bar, trial counsel made a strategic decision not to make an opening statement and therefore precluded the state from ascertaining the defense planned. The defendant has shown no specific prejudice from this strategic decision.
Defendant further suggests trial counsel failed to cross-examine Detective Caprera regarding the free and voluntary nature of the statements made by the defendant. The defendant is correct that trial counsel did not cross-examine Detective Caprera at trial concerning the voluntary nature of the statements made by the defendant to the police. However, review of the transcript from the suppression hearing reveals that trial counsel extensively questioned Detective Caprera at the suppression hearing on the free and voluntary nature of *608 the defendant's statement. Further, the defendant cannot show any prejudice from this allegation of ineffective assistance of counsel. The trial court correctly denied the defendant's motion to suppress the confession.
Trial counsel was also allegedly ineffective for failing to object to the state's reference to the defendant's inculpatory statements in its opening statement. La. C.Cr.P. article 767 provides that "[t]he state shall not in the opening statement, advert in any way to a confession or inculpatory statement made by the defendant unless the statement has previously been ruled admissible in the case." In the case at bar, defendant's statements had been ruled admissible at the suppression hearing. In addition, the state had complied with La.C.Cr.P. article 768 and provided the defendant with notice of its intent to use the inculpatory statement at trial. Thus, trial counsel had no basis for objecting to the state's reference to the defendant's inculpatory statement during its opening statement.
Defendant contends trial counsel did not effectively cross-examine Mr. Stafford on his inability to identify the defendant. Defendant's allegations are not supported by the trial record. The trial transcript reveals trial counsel extensively questioned Mr. Stafford on his description of the subject and his ability to see the person speaking to the victim. Further, Mr. Stafford admitted at trial he could not positively identify the defendant.
The defendant further suggests that trial counsel failed to object to the introduction of prior crimes at trial. The alleged prior crimes are the several attempted transactions at the ATM machines. These "prior crimes" were part of the res gestae of the murder and were correctly admitted into evidence.
La.C.E. art. 404(B)(1) provides:
Except as provided in Article 412, evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, provided that upon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial, of the nature of any such evidence it intends to introduce at trial for such purposes, or when it relates to conduct that constitutes an integral part of the act or transaction that is the subject of the present proceeding. (Emphasis added).
The final phrase replaces the term "res gestae" as provided for in former La. R.S. 15:447-448. Evidence of other crimes is admissible when it is related and intertwined with the charged offense to such an extent that the State could not have accurately presented its case without reference to it. State v. Brewington, 601 So.2d 656 (La.1992).
In the case at bar, the transactions at the various ATM locations are intertwined with the murder. The victim was killed in the late afternoon or early evening hours of June 30, 1995, and his wallet taken. The first ATM transaction occurred at 7:11 p.m., only a short time after the murder. Several other transactions were attempted within the next five hours at three other locations. The ATM videotapes reveal the defendant was the person to attempt these transactions. The ATM transactions occurred close in time and location to the murder and were in fact part of the entire criminal act to rob and kill the victim. Trial counsel had no basis for objecting to the introduction of evidence concerning the ATM transactions.
Trial counsel was also allegedly ineffective for failing to object to the introduction of the autopsy protocol to the jury. This allegation is not supported by the trial record. Dr. McGarry's autopsy protocol was admitted into evidence for record keeping purposes only. The protocol was not shown to the jury and was not reviewed by the jury during its deliberations.
This assignment of error is without merit.

Pro Se Assignment of Error No. 1
In his sole pro se assignment of error, defendant suggests the state failed to produce sufficient evidence to prove, beyond *609 a reasonable doubt, he was guilty of first degree murder.
When assessing the sufficiency of evidence to support a conviction, the appellate court must determine whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found proof beyond a reasonable doubt of each of the essential elements of the crime charged. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State v. Jacobs, 504 So.2d 817 (La.1987).
In addition, when circumstantial evidence forms the basis of the conviction, such evidence must consist of proof of collateral facts and circumstances from which the existence of the main fact may be inferred according to reason and common experience. State v. Shapiro, 431 So.2d 372 (La.1982). The elements must be proven such that every reasonable hypothesis of innocence is excluded. La.R.S. 15:438. La.R.S. 15:438 is not a separate test from Jackson v. Virginia, supra, but rather is an evidentiary guideline to facilitate appellate review of whether a rational juror could have found a defendant guilty beyond a reasonable doubt. State v. Wright, 445 So.2d 1198 (La.1984). All evidence, direct and circumstantial, must meet the Jackson reasonable doubt standard. State v. Jacobs, supra.
La.R.S. 14:30 defines first degree murder, in pertinent part, as "the killing of a human being ... [w]hen the offender has specific intent to kill or to inflict great bodily harm and is engaged in the perpetration or attempted perpetration of aggravated burglary... or ... [w]hen the offender has the specific intent to kill or inflict great bodily harm upon a victim under the age of twelve or sixty-five years of age or older."
The evidence presented at trial reveals that Paul Gernhauser, who was seventy-seven years of age, was murdered in the late afternoon or early evening hours of June 30, 1995. Dr. McGarry testified the cause of death was four blows to the back of the head with a heavy bar-like object. Detective Caprera and the Ezells testified the victim's wallet, watch and keys were missing, in addition to a green jewelry box and some jewelry. They testified that several drawers in the victim's bedroom were open when they arrived on the scene. After processing the scene, fingerprints were lifted from a sheet of computer paper found under the victim's left arm. These fingerprints were found to match the defendant's fingerprints.
Jan Ezell testified that when she called to report her father's credit cards as missing, she was informed that someone had attempted to use the victim's VISA card on the evening of June 30, 1995. Ruth Hooker of Bank One provided Detective Caprera with the times and locations of the attempted transactions. Detective Caprera obtained the ATM videotapes from the banks where the transactions were attempted. A still photograph was made from one of the videotapes. The photograph was released to the local television stations and the Times-Picayune. Mr. Emmett White contacted Detective Caprera after viewing the photograph in the Times-Picayune and identified the subject in the photograph as the defendant. Mr. White also informed the police that the defendant did not work on June 30, 1995. The information led the police to the home of the defendant's girlfriend.
When the officers were told the defendant was present in the apartment, he was arrested and advised of his rights. The defendant was taken to the homicide office and gave an initial statement to the police acknowledging the use of the credit card but denying any involvement in the victim's death. The officers then obtained a search warrant for the girlfriend's apartment. Upon executing the warrant, officers found a green jewelry box and some jewelry which the victim's family identified as belonging to the victim. In addition, the officers found a newspaper clipping of the defendant's photograph from the Times-Picayune among the defendant's clothing.
This evidence, both direct and circumstantial, was sufficient for the jury to find, beyond a reasonable doubt, that the defendant had the specific intent to kill the victim who was over the age of sixty-five during the course of an aggravated burglary.
This assignment is without merit.
*610 Accordingly, the defendant's conviction and sentence are affirmed.
AFFIRMED.