436 So.2d 451 (1983)
STATE of Louisiana
v.
Vernon Ray CHAPMAN.
No. 80-KA-2513.
Supreme Court of Louisiana.
May 23, 1983.
Rehearing Denied September 1, 1983.
William J. Guste, Jr., Atty. Gen., Barbara Rutledge, Asst. Dist. Atty., Marion B. Farmer, Dist. Atty., William R. Alford, Margaret A. Coon, Abbott J. Reeves, Asst. Dist. Attys., for plaintiff-appellee.
Richard Reynolds, Garic K. Barranger, Brady M. Fitzsimmons, Covington, for defendant-appellant.
LEMMON, Justice.
This is the second time that defendant's appeal is before us. On defendant's initial appeal, his conviction of aggravated rape and his sentence to life imprisonment were affirmed on original hearing and again on rehearing. However, this court granted a second rehearing and, although again affirming the conviction, remanded the matter to afford defendant an opportunity to introduce evidence in support of his motion for a new trial. See State v. Chapman, 410 So.2d 689 (La.1982).
The motion for a new trial was based principally on an affidavit submitted by a witness to the initial identification of defendant. In the affidavit (reproduced in full in footnote 3 of our opinion on rehearing at 410 So.2d at 711), the witness, a nurse who attended the rape victim at the *452 hospital, claimed that the chief of police prejudicially influenced the victim prior to her seeing defendant (who was then in custody) and also claimed that the victim expressed uncertainty immediately after identifying defendant.
At the hearing ordered by this court on the motion for new trial, defendant introduced the testimony of the nurse and other evidence tending to discredit the victim's identification of defendant as the rapist, as well as evidence that defendant had "passed" a polygraph test in which he denied raping the victim. The trial judge denied the motion for a new trial, and defendant has again appealed. The sole remaining issue is whether the trial judge improperly exercised his discretion in denying a new trial.

I.
The victim, a 57-year old widow, was awakened by noises on the front porch of her Madisonville residence at about 2:50 a.m. on June 3, 1979. Upon pulling aside the curtains, she saw a man (later unequivocally identified by her as defendant) attempting to open a window to enter her home. According to the victim, she had a good view of him because an outside light illuminated the porch area in which he was standing.
The man told the victim that he had been stabbed and asked her to open the door. When she stated that she would call the police, the man broke through the screen and glass and entered the house through the hole in the jalousied glass door. Once inside, the man grabbed the terrified victim, threw her down (causing her to cut her leg on the broken glass), and forced her through the dark house into her bedroom, where he raped her.
After completing an act of intercourse, defendant stole some money and fled. The victim saw him run from her home toward the street and cautiously followed him outside, where she heard a car speed off into the night.
When the police arrived at her home, the victim gave a detailed description of the assailant's physical characteristics and clothing (an open vee-neck shirt worn by hospital orderlies). Realizing that defendant fit the physical description and that he frequently wore a hospital scrub shirt, the chief of police dispatched an officer to check on defendant and another suspect.[1]
When the officer arrived at defendant's home at about 3:30 a.m., he discovered that defendant's automobile engine was warm and that tire tracks were visible in the early morning dew (indicating that the car had recently been driven into the yard). Defendant's wife answered the door and acknowledged that defendant had only recently returned home. Observing defendant in bed without a shirt, the officer noticed cuts on his side and back. The officer also noticed a green vee-neck shirt with blood stains on it.
Defendant was taken in handcuffs to a local hospital, where the victim had been taken for treatment.[2] While the victim was in the emergency room in a curtained-off treatment area, an officer told her that they had a suspect for her to view.[3] When the curtain was pulled back and the victim (seated in a wheel chair) came face to face with defendant, she immediately and very emotionally cried out that defendant was *453 the rapist. Defendant was then booked for aggravated rape.
The victim's positive identification of defendant as her assailant, both in the hospital and in later courtroom proceedings, formed the basis of the prosecution.[4] Since the state's other evidence was circumstantial, the victim's positive identification was critical.[5]
At the trial, defendant presented the testimony of an expert concerning studies which tended to discredit eyewitness identification generally.[6] In addition, several alibi witnesses testified that defendant was in a local barroom at the approximate time of the rape. Defendant also testified, flatly denying that he was the rapist and directly contradicting the testimony of some of the investigating officers. Despite his firm denials and a vigorously presented defense, the jury obviously credited the victim's positive identification, as corroborated by some circumstantial evidence (which by itself was by no means conclusive).

II.
In this context, we now proceed to review the trial judge's exercise of discretion in denying defendant's motion for a new trial.
At the hearing on the new trial motion, the defense presented a state policeman who had administered a polygraph test shortly after defendant's arrest and release on bail. The results of the test, which was conducted at defense counsel's office, led the officer to conclude that defendant responded truthfully when he denied raping the victim. On cross-examination, the officer admitted that he had not ascertained all of the details of the offense before conducting the test and that it is especially difficult in a rape case to formulate questions which produce the most accurate findings. Nevertheless, the officer opined that the testing, which indicated no deception, was accurate.
In denying the new trial, the trial court stated that he gave little weight to the "exculpatory" polygraph evidence.
In State v. Catanese, 368 So.2d 975 (La.1979), this court held that the trial court may consider a properly conducted favorable polygraph test result as a factor in support of granting a new trial to serve "the ends of justice". La.C.Cr.P. Art. 851(5). However, the Catanese decision indicated that such evidence does not necessarily entitle a defendant to a new trial. Therefore, we cannot say, particularly in view of the polygraph operator's own admissions regarding the weaknesses in his questions, that the judge abused his discretion *454 in according little weight to the polygraph results.
The newly discovered evidence issue presents a much more difficult problem. The evidence, as indicated earlier, consisted of the testimony of a nurse who claimed to have been attending the victim in the emergency room at a local hospital when defendant (who had apparently known the nurse from his previous employment as a hospital orderly) was brought in for identification. The nurse testified at the hearing that the chief of police made a racially derogatory remark about defendant and in effect told the victim that they "had the man" who had committed the rape before she was presented with an opportunity to see defendant.[7] She also testified that the victim expressed uncertainty about her identification.
Given the already less than ideal setting in which the initial identification occurred, this evidence, if credited by the jury, would doubtlessly have weakened the state's case, which rested largely on the strength of the victim's positive in-court identification. However, the chief, the other officers, and the victim expressly and without reservation denied that the chief conducted the "show-up" in the manner described by the nurse. In denying the motion, the trial judge remarked that the nurse's revelations (which he termed "late" because she did not come forward until after the trial) were "highly suspect".[8]
In ordering a hearing on the motion for a new trial, this court mandated that the trial court hear the testimony of the nurse witness (and the testimony of state witnesses who might contradict her) and weigh its probable impact on the jury's verdict in light of the evidence presented at the trial. Obviously, the trial judge who heard the trial evidence is uniquely suited to weigh the probable effect of the nurse's testimony. Furthermore, the judge's assessment regarding the credibility of the new witness (versus that of the witnesses at trial and also of those witnesses who directly contradicted the new witness at the hearing) is very significant, because the trial judge can better assess what credence (and hence, what weight) the jury would likely have given to the new witness' testimony. In this case, we cannot conclude that the trial judge erroneously exercised his discretion in deciding that defendant had not shown that the newly discovered evidence "probably would have changed the verdict".
There were several factors in this case which reasonably led the judge to conclude that the jury would probably not have assigned much weight to the nurse's version of the events in the emergency room. First, the nurse's testimony was not affirmatively exculpatory (such as the testimony of a newly discovered and unimpeachable alibi witness). She merely gave a more damning version of the already highly challenged "one to one" show-up. As noted earlier, the trial judge exercised his discretion to allow defendant to present the testimony of a psychologist to the jury on the weakness of eyewitness identifications. The jury was also aware that defendant *455 was brought (in handcuffs) before the victim in a "one to one" show-up only a couple of hours after the rape and that she was told that the officers had a suspect for her to view. On the other hand, the victim testified that she had an excellent opportunity to view defendant as he stood in the well-lighted porch area before breaking into her house. The jury weighed the strengths and weaknesses of the identification evidence and was obviously convinced beyond a reasonable doubt that the victim's in-court identification stemmed from her having seen defendant on her porch on the night of the rape.
Second, the weight of the nurse's version was undermined by several factors. She apparently was aware of defendant's arrest, but said nothing until after the trial was over. Defendant himself was obviously present at the confrontation, but said nothing in his trial testimony about the racially derogatory remark ("Get his black ass out of here") which (according to the nurse) was shouted by the chief to the officers holding defendant in their custody. Probably most significant is the testimony of the victim and the officers which directly contradicts the nurse. The chief and one of the officers, as well as the victim, explicitly denied the racial epithets, and the other officers (who were also in the room, but further away) denied hearing any such remarks. Finally, the victim denied ever having or expressing any reservations about identification.
Thus, using our analysis in State v. Talbot, 408 So.2d 861 (La.1981), we conclude that defendant has not shown that the trial court erred in refusing to find that the newly discovered evidence was so "fit for a new jury's judgment" that a new trial was required.[9]
Defendant's conviction and sentence are affirmed.
CALOGERO, J., dissents.
DENNIS, J., dissents and assigns reasons.
DENNIS, Justice, dissenting.
I respectfully dissent.
The test applied in reviewing a trial court's determination of whether newly discovered evidence warrants a new trial is not whether the trial judge reasonably disbelieved the new evidence or whether a jury probably would have believed it. These are the tests which the majority actually seems to apply.
In footnote number nine, the majority opinion alludes to what I believe is the correct test:
Will another jury, conscious of its oath and conscientiously obedient to it, probably reach a verdict contrary to the one that was reached on a record wholly different from the present, in view of the evidence recently discovered and not adducible by defense at the time of the original trial?
408 So.2d at 885.
Under this test, if a conscientious jury, hearing the case anew, including the newly discovered evidence, probably would have a reasonable doubt as to the guilt of the defendant, a new trial should be granted. When this test is applied correctly, it is evident that any reasonable, conscientious jury probably would have been shaken enough to have a reasonable doubt by the disinterested witness's testimony as to the prejudicial circumstances which preceded, and the expressions of doubt and uncertainty which followed, the victim's one-on-one identification of the culprit.
NOTES
[1] The other suspect was determined to have been at home at the time of the incident.
[2] Defendant had not yet been told he was "under arrest", although he had been handcuffed and advised of his rights.
[3] The officer contended that he utilized this identification procedure to determine whether he had the right suspect, intending to release defendant if the victim "cleared" him. Such prompt "one to one" confrontations have generally been accepted because they do lead to a speedy release of an innocent suspect and because the short period between the offense and the viewing may even promote a more accurate identification. See State v. Bland, 260 La. 153, 255 So.2d 723 (La.1971); State v. Richey, 258 La. 1094, 249 So.2d 143 (La.1971); Russell v. United States, 408 F.2d 1280 (D.C.Cir.1969); Bates v. United States, 405 F.2d 1104 (D.C.Cir. 1968).
[4] The admissibility of the victim's in-court identification was litigated in a pretrial motion, and this court upheld the trial court's denial of the motion to suppress. The trial judge determined that the victim had sufficient opportunity to view defendant at the time of the rape so that her in-court identification stemmed from her recollection of him and that she was not prejudicially influenced by the "one to one" hospital confrontation. State v. Chapman, above. See also Manson v. Braithwaite, 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977). Compare State v. Newman, 283 So.2d 756 (La. 1973).
[5] The state's other evidence consisted primarily of the testimony of defendant's friend, who saw defendant in his automobile in the vicinity of the victim's house, and of crime lab technicians, who found body fluids consistent with defendant's blood type (and not consistent with the victim's) at the scene of the rape. The defense challenged the technician's testimony, criticizing the handling of the evidence and the fact that certain tests were not performed which might have "cleared" defendant.
[6] The trial court permitted Dr. Robert Buckhout, a psychologist, to testify concerning his research which substantially tended to discredit the accuracy of much eyewitness testimony, especially when the victim's observations were made under certain circumstances (such as those present in defendant's situation).

This court held in State v. Stucke, 419 So.2d 939 (La.1982), that defendant was not entitled to offer such evidence, on the theory that the potential persuasiveness of this type of testimony might have a greater influence on the jury than the other evidence and might thus invade the province of the jury. A concurring opinion emphasized that the trial judge may (as was done here) exercise his discretion in favor of admitting such evidence, in the interest of justice, when the judge determines that the proffered evidence would assist the jury in deciding the question of identity. 419 So.2d at 951.
[7] According to the nurse's version of the events, the chief of police came to the victim in the treatment area, leaned over next to her in her wheel chair, and said, "Mrs. (Victim), we have the black son of a bitch bastard that did this to you and I want you to identify him for us." Defendant was then brought before the victim, who merely looked up and said "Yes". Then the chief shouted, "We've got his black ass. Get him out of here", or words to that effect. The victim immediately thereafter expressed grave reservations about whether defendant was the rapist.

As will be discussed below, the chief and the other policemen who participated in the identification procedure, as well as the victim, denied that the chief made such statements. It is noteworthy that one of the officers who participated in the challenged procedure (and who denied any racial slurs by the chief) was a black police sergeant.
[8] Since we hold that the trial court did not err in denying the motion for a new trial because the new evidence "probably" would not have changed the verdict, we do not address the question of defendant's possible lack of diligence in failing to discover the nurse's revelation. In our original opinion, however, we decided that defendant's failure to discover the nurse did not stem from a lack of diligent trial preparation.
[9] We cannot say that the trial judge "misused his discretion" in reaching a negative conclusion to the question posed in Talbot:

"Will another jury, conscious of its oath and conscientiously obedient to it, probably reach a verdict contrary to the one that was reached on a record wholly different from the present, in view of the evidence recently discovered and not adducible by defense at the time of the original trial?" 408 So.2d at 885.