793 So.2d 376 (2001)
STATE of Louisiana,
v.
Ontrell WASHINGTON.
No. 2000-KA-1055.
Court of Appeal of Louisiana, Fourth Circuit.
July 18, 2001.
Rehearing Denied September 14, 2001.
*378 Hon. Harry F. Connick, District Attorney, Julie C. Tizzard, Assistant District Attorney, New Orleans, LA, counsel for Plaintiff/Appellee.
Bart Stapert, New Orleans, La, counsel for Defendant/Appellant.
Court composed of Judge DENNIS R. BAGNERIS, Sr, Judge MICHAEL E. KIRBY, Judge TERRI F. LOVE.
KIRBY, Judge.

STATEMENT OF THE CASE
Defendant Ontrell Washington was charged by bill of information on December 1, 1998 with armed robbery, a violation of La. R.S. 14:64. Defendant pleaded not guilty at his December 4, 1998 arraignment. The trial court found probable cause and denied defendant's motion to suppress the evidence on January 5, 1999. Defendant was found guilty as charged at the conclusion of trial by a twelve-person jury on June 1, 1999. The trial court denied defendant's motions for new trial and for post-verdict judgment of acquittal on October 21, 1999. On November 4, 1999, the trial court sentenced defendant to thirty years at hard labor, without benefit of parole, probation or suspension of sentence, with credit for time served. The trial court also sentenced defendant to six months in parish prison for contempt, to run consecutively to the thirty-year sentence. The trial court denied defendant's written motion to reconsider sentence, and granted defendant's motion for appeal.

FACTS
New Orleans Police Detective Hal Amos testified that he and Detective Thomas investigated an armed robbery in the Mid-City area of New Orleans on the night of September 17, 1998. The victim, Mr. Le-Beouf, informed them that he answered his door to find two men asking for another subject who did not reside there. The two men forced their way inside and produced handguns. Det. Amos recalled that the front room of the residence was well lit, and that other lights were also on.
*379 Albert LeBeouf testified that he built computers and was a computer server administrator for a law office. He testified that on September 17, 1998, his fiancée had gone to pick up a take-out order for their dinner. He was sitting on his sofa with his two sons watching "The World's Greatest Police Chases" on television, when he heard a knock at his door shortly after 8:00 p.m. He had his six-month old son in his hands when he opened the door to find two males he had never seen before. They asked if "Joe" was there, and Mr. LeBeouf replied in the negative, and suggested the men try next door. When he attempted to close the door, the men pulled out guns. He initially attempted to close the six-paned glass front door, and pushed one of the men's guns with the door. Mr. LeBeouf said "they" pointed "a" gun at his six-month old son, and he decided he could not safely stop them from entering. He stepped back, placed his younger son onto the couch with the two-year old, and moved away from his children. Julian, his two-year old, started to come toward his father, but Mr. LeBeouf directed him to stay on the couch. Mr. LeBeouf testified that the intruder he identified as defendant asked him where his laptop computer was, and where the money was. Defendant pushed at him with the gun, called him "bitch," asked if he wanted to be shot, and ordered him to kneel. Once he got on the floor, defendant put the gun a nickel-plated .38 or .357 magnum revolver in his mouth and asked him if he wanted to die. Defendant said the second intruder was panicky, and the only time he did something was when defendant directed him to. Defendant directed his accomplice to go into the back and find the money, on the computer table in the third bedroom, which Mr. LeBeouf said he used as his office. A door leading to the back of the residence was closed to keep the LeBeoufs' cats out of the front, and defendant threatened Mr. LeBeouf that if there was anybody in that part of the residence he would shoot him. Defendant asked Mr. LeBeouf where the rest of his money was, and pulled everything out of his pockets, including his bankcard and some more money, which defendant took. When the second intruder came back with the three hundred and fifty dollars, both men started asking where the rest of money was. Mr. LeBeouf said the front room of the residence was well lit. There was a light on the wall as one entered the residence, an overhead light, and at least one of two lamps in the room was on. Mr. LeBeouf said defendant was not wearing a mask, and that he got a good look at his face. He said the defendant was taller than the second intruder. He estimated that the ordeal lasted four minutes. Mr. LeBeouf said that as the two men were preparing to leave, defendant kind of bit his lip and gestured with his gun as if he were going to shoot. Mr. LeBeouf said he was looking at defendant's face, and could see in defendant's eyes that he was going to kill him. Mr. LeBeouf reported the robbery to police that night.
On the Saturday before Hurricane George was predicted to strike New Orleans, around October 3, Mr. LeBeouf was packing his computers, stereo and other valuables to take to his father's home. As he was going back and forth to his car, he saw several youths on the front porch of the residence two doors down toward Canal Street. He immediately recognized one of them as defendant, who was boisterously proclaiming that he was not going to run from any hurricane, etc. Mr. LeBeouf said defendant apparently recognized him also, because he came and knocked on his door. Defendant accusingly told Mr. LeBeouf that his sister had been saying that defendant had robbed the LeBeoufs. Mr. LeBeouf stated that at this point he was *380 very concerned for his and his family's safety, fearing that defendant might retaliate against them if he believed he had gone to the police. Therefore, he told the defendant that it was just a matter between the two of them, indicating that he had not gone to police. Later in the day, Mr. LeBeouf noticed defendant in front of a residence on Cleveland Street, approximately two blocks from his own residence. Mr. LeBeouf said he delayed reporting this information to Det. Thomas because he feared for his family's safety. However, he told Det. Thomas approximately two weeks later that he possibly knew where defendant lived. Det. Thomas subsequently asked defendant to come to the Third District police station. There, Det. Thomas handed him a photo lineup, asking him to take his time and look at it. Mr. LeBeouf said Det. Thomas did not suggest that the person who robbed him was in the lineup, nor even say anything like "this is a photograph of some guys, the person who robbed you might be in it." Mr. LeBeouf said when he looked at the lineup he immediately recognized defendant's photo. He signed it, noting the date and time. Mr. LeBeouf said he did not know defendant and had never seen him before the robbery. Mr. LeBeouf said that when he first saw defendant two doors down from his residence he had no doubt that it was the person who robbed him, that when he saw him on Cleveland Street he had no doubt that it was the person who robbed him, and that when he saw the photo lineup he had no doubt that it was the person who robbed him. He was one hundred percent certain.
Mr. LeBeouf conceded on cross examination that when defendant came to his door around the time of the hurricane he did not see a gun, and that defendant did not threaten him. However, he felt defendant's presence alone was a threat. He said defendant denied having robbed him. Mr. LeBeouf said that his porch light was burned out on the night of the robbery.
Consuela Washington Sanders, defendant's mother, testified that she was employed by Advanced Security and Wal-Mart. Police came to her home twice concerning defendant, during the last week of October and the first week of November. On the second occasion, they informed her that they had a warrant for defendant's arrest. She took him to the police station the next day. Mrs. Sanders stated that Ontrell visited his good friend Roynell Johnson at Johnson's home every day, which was located one block from the street they lived on. Mrs. Sanders said that the defendant received a monthly social security benefit check in the amount of two hundred and forty-four dollars, which she allowed him to have. She said the defendant was also a rapper, and in fact was in a recording studio when police came to their home to arrest him. Defendant had been a student at Fortier. Mrs. Sanders did not remember the night of September 17, 1998, but said that she knew he was not outside at night, that he was usually inside before dark. That was a rule she enforced. She claimed he did not own a gun. She stated on cross examination that her curfew for him was about 6:00 or 6:30 p.m. She said Roynell Johnson lived in a double residence next door to another double where the victim lived. Mrs. Sanders stated that when the defendant was at home he usually listened to music, rapped, and talked on the telephone to girls and to his friends.
Roynell Brashiers [Johnson] testified that he lived at 116 South Murat Street. He said the victim used to live in the house next door. He recalled when the victim was robbed, because when he came home he saw the police. Roynell knew Ortrell Washington, the defendant from Kennedy High School, and said he used to come to *381 his home often, where they would spend time outside on his porch. Defendant came to his home before the robbery occurred, and came afterward; nothing changed. Defendant never exhibited any behavior to indicate that he did not want anyone to see him there. Roynell said he talked to defendant on the night of the robbery, and recalled informing him that police were at the house next door. Roynell said on cross examination that defendant was not at his home on the night of the robbery, but he said defendant came over the next day.
Deidra Johnson, Roynell's mother, testified that defendant came to her home often, and he continued to come over after the robbery. When asked whether she knew whether defendant would usually go home before dark, Ms. Johnson replied that when the lights came on, defendant "was gone."

ERRORS PATENT[1]
A review of the record reveals no errors patent.

ASSIGNMENT OF ERROR NO. 1
In his first assignment of error, defendant argues that the trial court erred in transferring the case from juvenile court to district court.
Louisiana Children's Code art. 303 provides in pertinent part:
A court exercising juvenile jurisdiction shall have exclusive original jurisdiction over:
(1) Delinquency proceedings pursuant to Title VIII [La. Ch.C. art. 801, et seq.], except when a child either:
(a) Is subject to the jurisdiction of the criminal courts for prosecution and liability as an adult pursuant to Chapter 4 of this Title [La. Ch.C. art. 305 et seq.].
(b) Has been transferred by the juvenile court for criminal prosecution and liability as an adult pursuant to Chapter 11 of Title VIII [La. Ch.C. art. 857 et seq.]. (Footnotes omitted).
La. Ch.C. art. 305 provides in pertinent part:
B. (1) When a child is fifteen years of age or older at the time of the commission of any of the offenses listed in Subparagraph (2) of this Paragraph, he is subject to the exclusive jurisdiction of the juvenile court until whichever of the following occurs first:
(a) An indictment charging one of the offenses listed in Subparagraph (2) of this Paragraph is returned.
(b) The juvenile court holds a continued custody hearing and finds probable cause that the child has committed any of the offenses listed in Subparagraph (2) of this Paragraph and a bill of information charging any of the offenses listed in Subparagraph (2) of this Paragraph is filed.
(2)(a) Attempted first degree murder.
(b) Attempted second degree murder.
(c) Manslaughter.
(d) Armed robbery.
(e) Aggravated burglary.
(f) Forcible rape.
(g) Simple rape.
(h) Second degree kidnapping.
(i) Aggravated oral sexual battery.
(j) Aggravated battery committed with a firearm.
(k) A second or subsequent aggravated battery.
(l) A second or subsequent aggravated burglary.
(m) A second or subsequent offense of burglary of an inhabited dwelling.

*382 (n) A second or subsequent felonygrade violation of Part X or X-B of Chapter 4 of Title 40 of the Louisiana Revised Statutes of 1950 involving the manufacture, distribution, or possession with intent to distribute controlled dangerous substances.
(3) The district attorney shall have the discretion to file a petition alleging any of the offenses listed in Subparagraph (2) of this Paragraph in the juvenile court or, alternatively, to obtain an indictment or file a bill of information. If the child is being held in detention, the district attorney shall make his election and file the indictment, bill of information, or petition in the appropriate court within thirty calendar days after the child's arrest, unless the child waives this right.
(4) If an indictment is returned or a bill of information is filed, the child is subject to the exclusive jurisdiction of the appropriate court exercising criminal jurisdiction for all subsequent procedures, including the review of bail applications, and the child shall be transferred forthwith to the appropriate adult facility for detention prior to his trial as an adult.
It is the district attorney who has the right under La. Ch.C. art. 305(B) to transfer the juvenile to criminal district court, not the trial court. State v. Dixon, 98-0090, p. 6 (La.App. 4 Cir. 6/3/98), 712 So.2d 1078, 1081. No hearing is required. Id. Thus, defendant's prosecution was not transferred to the district court by the trial court. Rather, exclusive jurisdiction vested in the district court by operation of law upon the district attorney's filing of the bill of information charging defendant, who was fifteen years old at the time of the commission of the offense, with armed robbery.
Defendant presents an argument pertaining to Chapter 11 of the Children's Code, La. Ch.C. art. 857 et seq. La. Ch.C. art. 857 provides in pertinent part:
A. The court on its own motion or on motion of the district attorney may conduct a hearing to consider whether to transfer a child for prosecution to the appropriate court exercising criminal jurisdiction if a delinquency petition has been filed which alleges that a child who is fourteen years of age or older at the time of the commission of the alleged offense but is not otherwise subject to the original jurisdiction of a court exercising criminal jurisdiction has committed any one or more of the following crimes:. .... (emphasis added).
In Dixon, supra, this court held that where the district attorney files a bill of information pursuant to La. Ch.C. art. 305(B), giving the district court exclusive jurisdiction over the juvenile's prosecution, the case does not fall within La. Ch.C. art. 857(A)'s exception "not otherwise subject to the original jurisdiction of the criminal court." 98-0090 at p. 6, 712 So.2d at 1081.
Defendant concedes that "it appears" that La. Ch.C. art. 305 supercedes La. Ch.C. art. 857 et seq., but makes the conclusory statement in the last sentence of his assignment of error that "the denial of an individualized transfer hearing violates his federal and state constitutional rights." However, defendant cites no authority and presents no argument as to why his rights are violated by the application of La. Ch.C. art. 305.
There is no merit to this assignment of error.

ASSIGNMENT OF ERROR NO. 2
In this assignment of error, defendant claims the trial court erred in denying his motion to suppress the identification.
*383 The defendant bears the burden of proving that an out-of-court identification was suggestive, and that there was a substantial likelihood of misidentification as a result of the identification procedure. State v. Ballett, 98-2568, p. 17 (La.App. 4 Cir. 3/15/00), 756 So.2d 587, 597, writ denied, XXXX-XXXX (La.2/9/01), 785 So.2d 31; see also La.C.Cr.P. art. 703(D) (the burden of proof is on the defendant to prove the ground of his motion to suppress). A defendant must first prove that the identification was suggestive. State v. Thibodeaux, 98-1673, pp. 20-21 (La.9/8/99), 750 So.2d 916, 932, cert. denied, 529 U.S. 1112, 120 S.Ct. 1969, 146 L.Ed.2d 800 (2000). An identification procedure is suggestive if it focuses attention on the defendant. State v. Laymon, 97-1520, p. 16 (La.App. 4 Cir. 3/15/00), 756 So.2d 1160, 1172. However, even a suggestive identification will be admissible if it is found reliable under the totality of circumstances. Id. In Manson v. Brathwaite, 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977), the United States Supreme Court set forth a five-factor test to determine whether an identification is reliable: (1) the opportunity of the witness to view the assailant at the time of the crime; (2) the witness's degree of attention; (3) the accuracy of the witness's prior description of the assailant; (4) the level of certainty demonstrated by the witness; and (5) the length of time between the crime and the confrontation. State v. Green, 98-1021, p. 12 (La.App. 4 Cir. 12/22/99), 750 So.2d 343, 350, writ denied, XXXX-XXXX (La.8/31/00), 766 So.2d 1274. In reviewing a trial court's ruling on a motion to suppress, an appellate court is not limited to evidence adduced at the hearing on the motion, but may also consider any pertinent evidence given at trial of the case. State v. Nogess, 98-0670, p. 11 (La.App. 4 Cir. 3/3/99), 729 So.2d 132, 137.
Defendant argues that the identification procedure was unduly suggestive because the photographic lineup was not shown to the victim until after he had seen defendant in the neighborhood at least three times following the robbery. However, this argument is not directed to a suggestive identification procedure, but rather is directed to the reliability of the victim's identification. Accordingly, as defendant has failed to meet his threshold burden of proving that the identification procedure was suggestive, he has failed to prove that the trial court erred in denying the motion to suppress the identification.
There is no merit to this assignment of error.

ASSIGNMENT OF ERROR NO. 3
In this assignment of error, defendant asserts that the trial court erred in ruling that expert testimony on eyewitness identifications was inadmissible, and in denying his request for funds for such motion. The record does not reflect that the trial court ruled that such expert testimony was not admissible, only that it denied defendant's written motion for funds for such an expert. It can be noted that defendant's motion for new trial sets forth as a ground that the trial court erred in ruling that such testimony on eyewitness identification was inadmissible. It can be presumed that the trial court denied defendant's written motion for expert witness funds because it ruled that it would not admit such testimony.
La. C.E. art. 702 sets forth the general rule governing the admissibility of expert testimony, and states:
If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may *384 testify thereto in the form of an opinion or otherwise.
La. C.E. art. 403 provides:
Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or waste of time.
In State v. Stucke, 419 So.2d 939 (La. 1982)[2], the Louisiana Supreme Court found that a trial court did not err in excluding the testimony of a psychologist as to the reliability of the victim's identification, based on the expert's experiments with staged crimes. The court noted on appeal that the issue of the acceptance of expert testimony regarding eyewitness testimony was res nova in Louisiana. The court reviewed several cases from other jurisdictions and concluded that the prejudicial effect of such expert testimony outweighed its probative value, because of the substantial risk that the potential persuasive appearance of the expert witness would have a greater influence on the jury than the other evidence presented during the trial.
In State v. Chapman, 436 So.2d 451 (La.1983), the Louisiana Supreme Court stated in its recitation of evidence introduced at trial that the defendant presented the testimony of an expert concerning studies which tended to discredit the accuracy of eyewitness identifications generally, but the admissibility of that expert testimony was not an issue on appeal. The court cited Stucke in a footnote, noting a concurrence emphasizing that a trial court may exercise its discretion in favor of admitting such evidence upon determination that it would assist the jury in deciding the question of identity.
In State v. Gurley, 565 So.2d 1055 (La. App. 4 Cir.1990), the trial court refused to allow expert testimony on the psychological factors affecting the reliability of eyewitness identifications. This court cited Stucke and two cases from other circuits that followed Stucke, and held that the trial court did not abuse its discretion in refusing to allow the expert testimony.
In a recent case, State v. Laymon, 97-1520 (La.App. 4 Cir. 3/15/00), 756 So.2d 1160, the trial court denied defendant's request to call an expert in eyewitness identification who would have testified to the traumatic nature of the shooting involved and its effect on the victim's ability to make accurate identifications. This court quoted extensively from Stucke, cited this court's previous decision in Gurley and a case from another circuit following Stucke, and concluded:
The twelve jurors in this case were presented with myriad reasons all perfectly understandable by laymen why they should not credit the identifications made by Lionel Burr. The trial court could have reasonably decided, under La. C.E. art. 403, that any benefit from the proffered testimony would have been outweighed by its creation of confusion and/or undue prejudice. Considering Stucke and Gurley, we hold that the trial court did not abuse its discretion in refusing to allow the testimony.
In State v. Ford, 608 So.2d 1058 (La. App. 1 Cir.1992), the trial court denied the defendant's motion to allow testimony from an expert witness as to the fallibility of eyewitness identification. The victim of a rape was driving with an acquaintance *385 looking for her car, which had been stolen by the rapist. The victim observed the defendant cleaning out her car twelve blocks from her home. When the defendant saw the victim, he entered the stolen car and fled. The victim and her acquaintance both identified the defendant in a photo lineup, and the acquaintance identified him in a physical lineup. On appeal, the court cited Stucke, but noted that in Chapman the court had allowed expert testimony concerning studies generally reflecting the fallibility of eyewitness testimony. The court stated that from its review of the record it found no abuse of discretion in the trial court's ruling that the defendant's expert testimony was inadmissible. The court found that there was testimony from which the jury could determine the facts based on common knowledge, education and experience, and that the expert opinion evidence concerning the fallibility of human perception and memory in general was not necessary for the jury to resolve the identity issue.
Defendant cites U.S. v. Alexander, 816 F.2d 164 (5 Cir.1987), where the court of appeals reversed the conviction of a physician convicted of bank robbery based on eyewitness identifications by three bank employees, finding that the trial court erred in denying defendant's request to present the testimony of two experts. One expert was an orthodontist specializing in the celphalometry, the scientific measurement of the dimensions of the head. The other expert was a former F.B.I. agent with expertise in photographic comparison. Both men had examined the film taken during the bank robbery and concluded that it was impossible for the defendant to be the person depicted in the photographs. The testimony of the orthodontist would have illustrated claimed specific differences in the facial features of the man depicted on the film and the defendant as a result of the expert's scientific analysis of the photographs. The court found that it was unlikely that any of the jurors were sufficiently informed about celphalometry to undertake such a comparison without expert assistance. The F.B.I. agent had a professional photographer take photographs of the defendant that duplicated the exact distance, camera angle, and focal length of the photographs taken at the bank. The agent would have presented testimony regarding the amount of distortion in the photos taken by the bank cameras and the effect such distortion would have upon the subject of the photos. The appellate court found this testimony would have aided the jury in comparing the photos, rather than confusing the jury as the district court held.
Alexander is clearly distinguishable from the instant case, where defendant apparently sought to present expert testimony, as stated in his written motion for funds to hire such expert, "that there is a `great potential' for misidentification when a witness identifies a stranger based upon a single, brief observation in a stressful situation." This is the type of evidence trial courts have refused to admit in Stucke, Gurley, Laymon and Ford, which decisions were upheld on appeal, and in fact is the type of expert testimony the court in Alexander found distinguishable from the evidence at issue in that case. Alexander, 816 F.2d at 169, distinguishing United States v. Moore, 786 F.2d 1308 (5 Cir.1986) (upholding the district court's exclusion of expert testimony as to general problems with eyewitness perception and memory).
Defendant distinguishes Stucke, Gurley and Laymon on the grounds that there was other evidence presented at these trials, unlike in the instant case where the sole evidence was the testimony of the victim. However, in Stucke, the *386 defendant robbed a convenience store, shot a pursuing off-duty sheriff's deputy twice, and was preparing to shoot him again when another off-duty deputy fired at the defendant, causing him to flee. The only identification made was by the wounded deputy. There was no mention of any physical evidence, and it can be presumed that the defendant was convicted on the eyewitness identification by that one deputy, along with perhaps some testimony by the second deputy who, even though he might not have been able to identify the defendant, could have perhaps verified some of the events. However, as in the instant case, the dispositive issue was identity, and only one witness made an identification of the defendant. In Stucke, the issue of whether the crime occurred was not in dispute, nor is it in dispute in the instant case. Thus, Stucke cannot be distinguished from the instant case in any meaningful way. It is well-settled that "[i]f credible, the testimony of a single witness may establish the elements of a crime beyond a reasonable doubt." State v. Boudreaux, XXXX-XXXX, pp. 6-7 (La.App. 4 Cir. 12/20/00), 777 So.2d 596, quoting State v. Womack-Grey, 99-0416, p. 17 (La. App. 4 Cir. 5/17/00), 764 So.2d 108, 119.
Defendant has failed to show that the trial court abused its discretion in denying his request to present expert testimony on eyewitness identifications. Mr. LeBeouf, the victim in this case, testified that the robbery took approximately four minutes. The lighting conditions in his apartment were excellent, and he looked directly at defendant's face, who was in his presence at all times during the robbery. The jury was well aware of all of the relevant facts and circumstances, and could assess the reliability of the victim's identification of defendant based on common knowledge, education and experience. As defendant could not present expert testimony on eyewitness identifications, the trial court did not abuse its discretion in denying his motion for funds to retain an expert to present such testimony. Defendant argues that even if he could not have presented the expert testimony, the trial court should have given him funds to secure such an expert to assist him in analyzing the eyewitness identification in this case. Defendant makes the general conclusory argument that the lack of such expert assistance was a critical handicap to his defense. However, trial counsel thoroughly cross examined the victim about the facts and circumstances surrounding the identification upon which the jury was to assess the accuracy and reliability of that identification. It was obvious from trial counsel's motion for expert witness funds and his cross examination of the victim that he was familiar with the factors affecting the reliability of eyewitness identifications. Defendant fails to show that his trial counsel was handicapped in his cross examination of the victim, or was otherwise impeded in the presentation of his defense due to the lack of funds to secure the assistance of an expert witness for consultation purposes.
There is no merit to this assignment of error.

ASSIGNMENT OF ERROR NO. 4
In this assignment of error, defendant claims the evidence was insufficient to support the conviction.
This court set out the well-settled standard for reviewing convictions for sufficiency of the evidence in State v. Ragas, 98-0011 (La.App. 4 Cir. 7/28/99), 744 So.2d 99, as follows:
In evaluating whether evidence is constitutionally sufficient to support a conviction, an appellate court must determine whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of act could have *387 found the defendant guilty beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State v. Green, 588 So.2d 757 (La.App. 4 Cir.1991). However, the reviewing court may not disregard this duty simply because the record contains evidence that tends to support each fact necessary to constitute the crime. State v. Mussall, 523 So.2d 1305 (La.1988). The reviewing court must consider the record as a whole since that is what a rational trier of fact would do. If rational triers of fact could disagree as to the interpretation of the evidence, the rational trier's view of all the evidence most favorable to the prosecution must be adopted. The fact finder's discretion will be impinged upon only to the extent necessary to guarantee the fundamental protection of due process of law. Mussall; Green, supra. "[A] reviewing court is not called upon to decide whether it believes the witnesses or whether the conviction is contrary to the weight of the evidence." State v. Smith, 600 So.2d 1319 (La.1992) at 1324.
In addition, when circumstantial evidence forms the basis of the conviction, such evidence must consist of proof of collateral facts and circumstances from which the existence of the main fact may be inferred according to reason and common experience. State v. Shapiro, 431 So.2d 372 (La.1982). The elements must be proven such that every reasonable hypothesis of innocence is excluded. La. R.S. 15:438. This is not a separate test from Jackson v. Virginia, supra, but rather an evidentiary guideline to facilitate appellate review of whether a rational juror could have found a defendant guilty beyond a reasonable doubt. State v. Wright, 445 So.2d 1198 (La. 1984). All evidence, direct and circumstantial, must meet the Jackson reasonable doubt standard. State v. Jacobs, 504 So.2d 817 (La.1987).
98-0011 at pp. 13-14, 744 So.2d at 106-107, quoting State v. Egana, 97-0318, pp. 5-6 (La.App. 4 Cir. 12/3/97), 703 So.2d 223, 227-228.
In addition, when identity is disputed, the State must negate any reasonable probability of misidentification in order to satisfy its burden under Jackson v. Virginia. State v. Edwards, 97-1797, pp. 12-13 (La.7/2/99), 750 So.2d 893, 902, cert. denied, 528 U.S. 1026, 120 S.Ct. 542, 145 L.Ed.2d 421 (1999); State v. Woodfork, 99-0859, pp. 4-5 (La.App. 4 Cir. 5/17/00), 764 So.2d 132, 134, writ denied, XXXX-XXXX (La.7/28/00), 766 So.2d 1263.
Defendant was convicted of armed robbery, a violation of La. R.S. 14:64. The State had to prove beyond a reasonable doubt that defendant took something of value belonging to another from the person of another or that was in the immediate control of another, by the use of force or intimidation, while armed with a dangerous weapon. Id.
Mr. LeBeouf was in defendant's presence for four minutes during the robbery. Defendant was in charge, and gave directions to his accomplice during the robbery. Mr. LeBeouf testified that the lighting in the front room of his residence, where he and defendant were during the course of the robbery, was excellent. Defendant struck Mr. LeBeouf in the head and stomach with his gun, ordered him to kneel, and then put the gun into his mouth. He asked Mr. LeBeouf if he wanted to die. He demanded to know where the money was, as well as defendant's laptop computer. Mr. LeBeouf looked directly at defendant's face, and into his eyes. He was one hundred percent certain that defendant was the robber. Defendant's demand for Mr. LeBeouf's laptop computer indicates a certain familiarity with the victim's *388 computer-related activities. If defendant regularly sat with Roynell Johnson on Johnson's front porch, next door to the victim's residence, he would have been in a position to observe the victim's activities. No evidence was introduced positively placing defendant somewhere else at the time of the robbery, although his mother testified that he had a curfew of 6:00 or 6:30 p.m., which she indicated he obeyed. Roynell Johnson's mother confirmed that when defendant visited their home he left around nightfall. Roynell Johnson said defendant did not visit his home on the day of the robbery.
"If credible, the testimony of a single witness may establish the elements of a crime beyond a reasonable doubt." State v. Boudreaux, XXXX-XXXX, pp. 6-7 (La.App. 4 Cir. 12/20/00), 777 So.2d 596, quoting State v. Womack-Grey, 99-0416, p. 17 (La. App. 4 Cir. 5/17/00), 764 So.2d 108, 119. Viewing all of the evidence in a light most favorable to the prosecution, any rational trier of fact could have found all of the essential elements of the crime of armed robbery present beyond a reasonable doubt, and found beyond a reasonable doubt that the State negated any reasonable probability of misidentification.
There is no merit to this assignment of error.

ASSIGNMENT OF ERROR NO. 5
In this assignment of error, defendant avers that the trial court imposed an unconstitutionally excessive sentence, and for that reason erred in denying his motion to reconsider sentence.
La. Const. art. I, § 20 explicitly prohibits excessive sentences; State v. Baxley, 94-2982, p. 4, (La.5/22/95), 656 So.2d 973, 977. Although a sentence is within the statutory limits, the sentence may still violate a defendant's constitutional right against excessive punishment. State v. Brady, 97-1095, p. 17 (La.App. 4 Cir. 2/3/99), 727 So.2d 1264, 1272, rehearing granted on other grounds, (La.App. 4 Cir. 3/16/99); State v. Francis, 96-2389, p. 6 (La.App. 4 Cir. 4/15/98), 715 So.2d 457, 461. However, the penalties provided by the legislature reflect the degree to which the criminal conduct is an affront to society. Baxley, 94-2984 at p. 10, 656 So.2d at 979, citing State v. Ryans, 513 So.2d 386, 387 (La.App. 4 Cir.1987). A sentence is constitutionally excessive if it makes no measurable contribution to acceptable goals of punishment, is nothing more than the purposeless imposition of pain and suffering, and is grossly out of proportion to the severity of the crime. State v. Johnson, 97-1906, pp. 6-7 (La.3/4/98), 709 So.2d 672, 677; State v. Webster, 98-0807, p. 3 (La.App. 4 Cir. 11/10/99), 746 So.2d 799, 801, reversed on other grounds, State v. Lindsey, 99-3256 (La.10/17/00), 770 So.2d 339. A sentence is grossly disproportionate if, when the crime and punishment are considered in light of the harm done to society, it shocks the sense of justice. Baxley, 94-2984 at p. 9, 656 So.2d at 979; State v. Hills, 98-0507, p. 5 (La.App. 4 Cir. 1/20/99), 727 So.2d 1215, 1217.
In reviewing a claim that a sentence is excessive, an appellate court generally must determine whether the trial judge has adequately complied with statutory guidelines in La.C.Cr.P. art. 894.1, and whether the sentence is warranted under the facts established by the record. State v. Trepagnier, 97 2427, p. 11 (La.App. 4 Cir. 9/15/99), 744 So.2d 181, 189; State v. Robinson, 98-1606, p. 12 (La.App. 4 Cir. 8/11/99), 744 So.2d 119, 127. If adequate compliance with La. C.Cr.P. art. 894.1 is found, the reviewing court must determine whether the sentence imposed is too severe in light of the particular defendant and the circumstances of the case, keeping in mind that *389 maximum sentences should be reserved for the most egregious violators of the offense so charged. State v. Ross, 98-0283, p. 8 (La.App. 4 Cir. 9/8/99), 743 So.2d 757, 762; State v. Bonicard, 98-0665, p. 3 (La.App. 4 Cir. 8/4/99), 752 So.2d 184, 185, writ denied, 99-2632 (La.3/17/00), 756 So.2d 324.
However, in State v. Major, 96-1214 (La.App. 4 Cir. 3/4/98), 708 So.2d 813, this court stated:
The articulation of the factual basis for a sentence is the goal of Art. 894.1, not rigid or mechanical compliance with its provisions. Where the record clearly shows an adequate factual basis for the sentence imposed, resentencing is unnecessary even when there has not been full compliance with Art. 894.1. State v. Lanclos, 419 So.2d 475 (La.1982). The reviewing court shall not set aside a sentence for excessiveness if the record supports the sentence imposed. La. C.Cr.P. art. 881.4(D).
96-1214 at p. 10, 708 So.2d at 819.
In State v. Soraparu, 97-1027 (La.10/13/97), 703 So.2d 608, the Louisiana Supreme Court stated:
On appellate review of sentence, the only relevant question is "`whether the trial court abused its broad sentencing discretion, not whether another sentence might have been more appropriate.'" State v. Cook, 95-2784, p. 3 (La.5/31/96), 674 So.2d 957, 959 (quoting State v. Humphrey, 445 So.2d 1155, 1165 (La. 1984)), cert. denied, 519 U.S. 1043, 117 S.Ct. 615, 136 L.Ed.2d 539 (1996). For legal sentences imposed within the range provided by the legislature, a trial court abuses its discretion only when it contravenes the prohibition of excessive punishment in La. Const. art. I, § 20, i.e., when it imposes "punishment disproportionate to the offense." State v. Sepulvado, 367 So.2d 762, 767 (La.1979). In cases in which the trial court has left a less than fully articulated record indicating that it has considered not only aggravating circumstances but also factors militating for a less severe sentence, State v. Franks, 373 So.2d 1307, 1308 (La.1979), a remand for resentencing is appropriate only when "there appear[s] to be a substantial possibility that the defendant's complaints of an excessive sentence ha[ve] merit." State v. Wimberly, 414 So.2d 666, 672 (La. 1982).
Id.
Defendant was subject to a sentence of not less than five, not more than ninety-nine years at hard labor, without benefit of parole, probation or suspension of sentence. La. R.S. 14:64 (as in effect at the time of the 1998 offense). The trial court ordered a presentence investigation report to assist it in sentencing defendant. Defendant was fifteen years old at the time of the crime. He was a first-felony offender, but had several misdemeanor convictions as a juvenile. He was arrested in March 1994 for carrying a concealed weapon, but no disposition was reflected. He was arrested in July 1994 for possession of stolen property and theft of goods, both involving property valued at less than one hundred dollars. No disposition was reflected for those offenses. He was picked up for a curfew violation in September 1997. In February 1998, he was arrested for simple assault, distribution of marijuana within 1,000 feet of a school, possession of marijuana, resisting an officer, and aggravated assault on a peace officer with a firearm. The firearm-related charge was refused, and the only disposition reflected with regard to the other charges was a misdemeanor conviction, with a six-month suspended sentence and two years probation. In April 1998, defendant was arrested for possession of stolen property and theft, both involving property *390 valued between one hundred and five hundred dollars. Defendant was convicted on the theft charge, for which he was sentenced to six months probation, and the possession charge was dismissed. In June 1998, five months before the armed robbery in the instant case, defendant was arrested for simple battery. He was convicted of that offense and sentenced to six months in the custody of the Department of Corrections, suspended, with one year probation.
At defendant's sentencing hearing his grandmother, Barbara Jackson, testified that she knew he was not guilty. She said that he was a good boy who helped her around the house and was very protective of her thirteen-year old child, defendant's aunt. Another of defendant's aunts, Tasmen Jackson, testified that she spent a lot of time with defendant, that he was an important friend to her, and that she never knew of him hurting anyone. Donald Washington, defendant's brother, testified that he knew defendant did not commit the crime, that he needed him home, and that he missed him. Defendant's mother simply requested that the trial court be lenient. Defense counsel argued that of seventy people released from death row after they were either exculpated or had serious doubts raised about their guilt, fifty-eight percent had been convicted on eyewitness testimony alone. Defense counsel noted that even though it would have been in defendant's best interest to inform police who his accomplice in the robbery was, he did not know because he did not commit the crime. Counsel noted that defendant was only fifteen at the time of the crime, and said that a lengthy incarceration would adversely impact his family.
The trial court flatly rejected the State's request that the maximum sentence of ninety-nine years be imposed. The trial court expressed concern about the charge of aggravated assault with a firearm, seeming to indicate that it believed defendant had been convicted of that offense. Defense counsel was apparently confused about that offense as well, and could only say that he did not believe that defendant was ever incarcerated for it. The trial court agreed with that statement. Both the presentence report and defendant's rap sheet clearly reflect that this charge was refused, and it can be presumed that the trial court realized that it was only an arrest, not a conviction, which arrest the trial court nevertheless was free to consider as an aggravating factor.[3],[4] The trial court's primary focus was the crime in the instant case, which it viewed as very serious. The court noted that defendant invaded Mr. LeBeouf's home at gunpoint, placed a gun in his mouth, struck him in the stomach and head with the gun, called him a bitch, and pointed a gun at the victim's six-month old son. The trial court sentenced defendant to thirty years at hard labor, without benefit of parole, probation or suspension of *391 sentence. Upon pronouncement of sentence, the record reflects that defendant stated to someone, perhaps a deputy, perhaps his attorney: "Don't touch me, man. Fuck." The trial court immediately retracted the thirty-year sentence and sentenced defendant to sixty years at hard labor. At a hearing the next day, November 4, 1999, which the trial court essentially stated was a continuance of the sentencing hearing, it sentenced defendant to thirty years at hard labor, without benefit parole, probation or suspension of sentence. The trial court also sentenced defendant to six months in parish prison for contempt of court, to run consecutively to the thirty-year sentence.
The only articulable argument defense counsel makes as to the excessiveness of the sentence is that the trial court allowed defendant's outburst to personally affect it and influence its sentence. The trial court did comment immediately after the outburst that the real defendant had shown himself, and that it now believed defendant did commit the crime. At the "resentencing" on the following day, the trial court again commented that the real defendant showed himself through that outburst, and indicated that consequently he could hear in his mind defendant saying similar words during the robbery. What defendant fails to acknowledge is that the thirty-year sentence ultimately imposed by the trial court was the same sentence it had originally imposed, prior to the outburst. Thus, the final sentence was not based on the trial court's reaction to defendant's outburst, but was based on the factors noted by the court in imposing the thirty-year sentence before the outburst.
In State v. Johnson, 99-0385 (La.App. 1 Cir. 11/5/99), 745 So.2d 217, writ denied, XXXX-XXXX (La.11/13/00), 774 So.2d 971, the court affirmed sentences of thirty and fifty-five years at hard labor, respectively, for aggravated burglary and armed robbery, as well as a consecutive ten-year sentence for armed robbery. The defendant was fifteen years old at the time of the offenses, and was a first-felony offender. However, he had some eighteen juvenile arrests, including some for armed robbery. The defendant, who maintained his innocence, had failed to successfully complete past probations. The facts of the aggravated burglary/armed robbery were that the defendant entered the home of an eighty-year old woman, pointed a pistol at her, demanded money, ordered her to kneel down after she told him she did not have that much, and took $11.00 from her purse. As the defendant was fleeing, he threatened to kill a neighbor who approached the victim's side door. That same morning, the defendant robbed a man at gunpoint of his automobile in the parking lot of his apartment complex.
In State v. Robinson, 98-1606 (La.App. 4 Cir. 8/11/99), 744 So.2d 119, this court vacated a thirty-year sentence for armed robbery imposed on a defendant who was nineteen years old at the time of the offense because the trial court failed to articulate any reasons at all for the sentence. Nor did the record furnish a sufficient factual basis for the sentence. The defendant testified that he was first-felony offender, and the record, which did not contain a presentence investigation report, contained nothing to contradict his assertion. There was no evidence of any prior arrests. Displaying a gun in his waistband, defendant had robbed a sixteen-year old bicycle rider of his beeper and tennis shoes.
In reviewing the claim of excessive sentence in Robinson, this court looked at two other cases:
In State v. Toomer, 461 So.2d 387 (La.App. 4 Cir.1984), this court reversed a fifty-year sentence imposed on a seventeen-year-old *392 first offender and remanded the matter to the trial court for resentencing after proper consideration of the guidelines in La.C.Cr.P. art. 894.1. The defendant had argued that the sentence was excessive and that the trial court failed to articulate the grounds therefore under La.C.Cr.P. art. 894.1 The court specifically noted that it was not holding that the fifty year sentence imposed on the defendant was necessarily excessive, only that it was not possible to make that determination because the trial court failed to comply with the dictates of La.C.Cr.P. art. 894.1.
In State v. Lofton, 96 1429 (La.App. 1 Cir. 3/27/97), 691 So.2d 1365, writ denied, 97-1124 (La.10/17/99), 701 So.2d 1331, the court held that a fifty-year sentence imposed on a first-felony offender convicted of armed robbery was not constitutionally excessive. The court noted that the defendant not only had put the gun to the victim's head as a threat, but had discharged the gun at least twice when the victim fled. The court felt that the defendant had committed an extremely serious offense, and that a lesser sentence would deprecate the seriousness of the offense.
98-1606 at pp. 13-14, 744 So.2d at 127.
Aside from the age of the victim in Johnson, the instant offense appears to have been more heinous than that one. Defendant pointed a gun at the victim's six-month old son to coerce the victim into complying with his demands. He struck the victim in the face and stomach with the gun, and put the gun into the victim's mouth after making him kneel. The victim testified that he was certain defendant was going to shoot him. The facts show that defendant is an extremely dangerous and brazen individual with a record of juvenile arrests and convictions. Unlike in Robinson and Toomer, the trial court gave adequate reasons for imposing the sentence. The court considered aggravating and mitigating factors, and the presentence investigation report.
It cannot be said that the sentence imposed on defendant makes no measurable contribution to acceptable goals of punishment, is nothing more than the purposeless imposition of pain and suffering, and is grossly out of proportion to the severity of the crime. Nor can it be said that when the crime and sentence are considered in light of the harm done to society, it shocks the sense of justice.
There is no merit to this assignment of error.

ASSIGNMENT OF ERROR NO. 7[5]
In his last assignment of error, defendant asserts that even if this court finds that no single error mandates reversal of his conviction, i.e., that all errors are deemed harmless, a new trial should be ordered due to the cumulative impact of the numerous errors preventing him from obtaining a fair trial. There were no cumulative errors regarding defendant's trial and conviction. Moreover, the Louisiana Supreme Court has held that the cumulative effect of harmless errors does not warrant reversal of a conviction or sentence. State v. Strickland, 94-0025, pp. 51-52 (La.11/1/96), 683 So.2d 218, 239; State v. Tart, 93-0772, p. 55 (La.2/9/96), 672 So.2d 116, 154.
There is no merit to this assignment of error.
For the foregoing reasons, defendant's conviction and sentence are affirmed.
AFFIRMED.
NOTES
[1] Defendant's Assignment of Error No. 6.
[2] Superceded on other grounds by rule as stated in State v. Ford, 608 So.2d 1058 (La. App. 1 Cir.1992).
[3] "The trial court is entitled to consider the defendant's entire criminal history in determining the appropriate sentence to be imposed." State v. Ballett, 98-2568, p. 25 (La. App. 4 Cir. 3/15/00), 756 So.2d 587, 602, writ denied, XXXX-XXXX (La.2/9/01), 785 So.2d 31
[4] In any case, assuming the trial court sentenced defendant believing that he had been convicted of the aggravated assault with a firearm offense, defense counsel did not object either at the sentencing or in his motion to reconsider sentence. See generally La. C.Cr.P. art. 881.1(D): "Failure to make [an oral] or file a [written] motion to reconsider sentence or to include a specific ground upon which a motion to reconsider sentence may be based, including a claim of excessiveness, shall preclude the state or the defendant from raising an objection to the sentence or from urging any ground not raised in the motion on appeal or review."
[5] Defendant's Assignment of Error No. 6 was request for a review for errors patent.